Lawrence Dale CASADA,
Defendant–Appellant,

v.

STATE of Indiana, Plaintiff–Appellee.

No. 47A01–8903–CR–96.

Court of Appeals of Indiana,
First District.

Sept. 28, 1989.

Nick J. Herthel, Bedford, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Amy Schaeffer Good, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

RATLIFF, Chief Judge.

## STATEMENT OF THE CASE

Lawrence Dale Casada appeals his conviction of two (2) counts of Attempted Child Molesting, a class C felony.[1] We reverse and remand.

## FACTS

Casada was the step-father of E.T. E.T. lived with her own father, her step-mother and her siblings, but visited her mother and Casada for two (2) weeks every summer. E.T. alleged that, while she was visiting her mother, Casada came into E.T.'s bedroom one evening on or about August 10, 1987. E.T. alleged that Casada got into bed with her, pulled up her nightgown and pulled down her panties. He then placed his penis in the area of her vagina and anus and wiggled back and forth, according to E.T.

The following day E.T. called her step-mother to take her home. The day following E.T.'s return home, she reported her allegations to her step-mother. Her step-mother informed her father and they took E.T. to the hospital emergency room where E.T. related her story to a nurse and a physician. On August 12, 1987, E.T. repeated her story to a police detective who took her complaint.

Although he had not been arrested or charged with Attempted Child Molestation, Casada signed a writing on October 2, 1987, which stated that he had requested to take a polygraph examination and was stipulating his agreement to the admissibility of the results. The prosecuting attorney also signed the stipulation agreement. Casada had no attorney at that time. The agreement included a statement that Casada acknowledged he fully understood the results of the polygraph examination could not be introduced at trial in the absence of his stipulation agreement. The stipulation agreement also included Casada's waiver of his fifth amendment right to remain silent to questions asked of him during the polygraph examination. After the prosecuting attorney and Casada signed the stipulation agreement, the polygraph examiner orally advised Casada of his *Miranda* rights, *see Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, including Casada's right to talk to a lawyer for advice before being asked any questions and to have his attorney with him during the questioning.[2] The polygraph examiner then reviewed the stipulation of admissibility with Casada, signed the agreement himself and administered the examination. On October 13, 1987, Casada was charged with Attempted Child Molesting and Child Molesting. The polygraph results were admitted by the State at jury trial over Casada's motion to suppress evidence, motion in limine, and trial objections.

Among other witnesses, the State called E.T. to testify during the State's case at Casada's trial. However, E.T. became so distraught on the witness stand that she was unable to answer even the State's first question. The State asked for a recess. During the recess a 6' × 4' chalkboard was repositioned so that E.T. and Casada could not see each other but the judge and the jury could see both E.T. and Casada. Photographs of the repositioned chalkboard were taken from several angles. The court returned to the record and described the repositioning of the chalkboard. The court stated that E.T. had become so distraught that the repositioning of the chalkboard had been necessary to enable E.T. to testify on direct examination. No further find-

---

1. Indiana Code section 35–42–4–3(c).

2. Specifically, Casada was advised of his rights as follows:

    "YOUR RIGHTS
    Before we ask you any questions, you must understand your rights.
    You have the right to remain silent.
    Anything you say can be used against you in court.
    You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
    If you cannot afford a lawyer, one will be appointed for you before questioning if you wish.
    If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

ings of the necessity of the repositioning to enable E.T. to testify were made on the record. E.T. was able to testify following the repositioning. The chalkboard was removed during cross-examination and redirect examination. The jury convicted Casada of two (2) counts of Attempted Child Molesting and the court entered judgment against Casada.

### ISSUES

Casada raises five issues on appeal. Because we find the first issue dispositive, we address only that issue and Casada's third issue, which is likely to arise upon retrial of the case.

1. Did the placement of a chalkboard between Casada and E.T. during direct examination of E.T. by the State deny Casada his constitutional rights to confront the witness against him and to be confronted by that witness?

2. Did the court correctly admit the results of Casada's polygraph examination where their admissibility was stipulated to by the State and Casada, *pro se*, before Casada was advised of his constitutional right to counsel and before he waived his right to counsel?

### DISCUSSION AND DECISION

*Issue One*

#### I.

Casada argues that his constitutional right to be confronted by a witness against him and to confront a witness against him was violated when the trial court ordered placement of a 6′ × 4′ chalkboard between Casada and E.T. During direct examination of E.T., Casada could not see E.T. and E.T. could not see Casada because of the placement of the chalkboard.

The sixth amendment of the United States Constitution guarantees an accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The sixth amendment's confrontation clause was made applicable to the states through the fourteenth amendment of the United States Constitution. *Pointer v. Texas* (1965), 380 U.S. 400, 403, 85 S.Ct. 1065, 1067–68, 13 L.Ed.2d 923, 926; *Franklin v. Duckworth* (N.D.Ind.1982), 530 F.Supp. 1315, 1319. In addition, Ind. Const. of 1851, art. I § 13 states that, "In all criminal prosecutions, the accused shall have the right ... to meet the witnesses face to face ..." Until recently both Indiana courts and federal courts held that the essential purpose of an accused's constitutional right to confrontation was to give an accused the opportunity to cross-examine the witnesses against him. In *Iseton v. State* (1984), Ind.App., 472 N.E.2d 643, we held that the purposes of the confrontation clauses of the federal and state constitutions are to insure reliability by means of the oath, to expose the witness to the probe of cross-examination, and to permit the trier of fact to weigh the demeanor of the witness. *Id.* at 648. Although the Indiana Constitution specifically provides criminal defendants with the right to confront their accusers face-to-face, the Indiana Supreme Court stated in *Miller v. State* (1987), Ind., 517 N.E.2d 64, 69, that cross-examination is the primary interest secured by the confrontation clause of Ind. Const. of 1851, art. I § 13. The United States Supreme Court held that the sixth amendment had similar purposes in *California v. Green* (1970), 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497. The Court reaffirmed these purposes as recently as *Lee v. Illinois* (1986), 476 U.S. 530, 540, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514, 526.

However, recently the United States Supreme Court clarified that the confrontation clause of the sixth amendment provides two types of protections for a criminal defendant. In *Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40, 53, a plurality of the Court held that the confrontation clause provides a criminal defendant both the right to physically face one who testifies against him, and the right to confront that witness and conduct cross-examination. Finally, in *Coy v. Iowa* (1988), —— U.S. ——, ——, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857, 864–65, a majority of the Court determined that an

accused has the right to be confronted face-to-face by a witness giving testimony against him. Writing for a majority of the court, Justice Scalia wrote that:

"The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it ...

"It is always more difficult to tell a lie about a person to his face than behind his back.... The confrontation clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions. Thus, the right to face-to-face confrontation serves much the same purpose as a less explicit component of the confrontation clause that we have more frequent occasion to discuss—the right to cross-examine the accuser; both ensur[e] the integrity of the fact-finding process."

—— U.S. at ——, 108 S.Ct. at 2802, 101 L.Ed.2d at 866 (citations omitted).

*Coy* involved an Iowa statute which permitted child witnesses to testify from behind a screen. The Court, holding that the Iowa statute unconstitutionally violated a defendant's right to confront his accusers, stated:

"The screen at issue was specifically designed to enable the complaining witnesses to avoid viewing the appellant as they gave their testimony, and the record indicates that it was successful in this objective. It is difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter."

*Id.*

In *Miller v. State* (1987), Ind., 517 N.E.2d 64, 71, the Court held that the confrontation clause in Ind. Const. art. I § 13 requires face to face confrontation and in *Miller v. State* (1988), Ind., 531 N.E.2d 466, the Court recognized the *Coy* holding that the sixth amendment also requires face-to-face confrontation. The Court discussed Ind.Code § 35–37–4–6, which allows a videotaped statement of a child under age 10 to be substituted for the victim's testimony at trial. Relying on *Coy* and the documented history of Ind.Code § 35–37–4–6(c)(1), *Miller* held that Ind.Code § 35–37–4–6 requires a child victim to physically confront an accused at some time. *Miller,* 531 N.E.2d at 470. The statute requires a pre-trial hearing to determine the admissibility of a child victim's out-of-court statement or video tape, which hearing must be adversarial in nature with physical confrontation between accused and victim. The purpose of the hearing "is to give the defendant the right, under less traumatic circumstances than a trial, to inquire into the statement or ask the child questions about it." *Miller v. State,* 517 N.E.2d at 71 (quoting *Miller v. State* (1986), Ind.App., 498 N.E.2d 1008, 1012). The legislature intended that the child testify during this hearing even if the child would be unavailable for trial. *Miller v. State,* 531 N.E.2d at 469. When it enacted Ind.Code § 35–37–4–6, the legislature intended the defendant's right of cross-examination to occur in an atmosphere less traumatizing to the victim; the legislature did not intend to restrict the defendant's right of cross-examination. *Miller v. State,* 517 N.E.2d at 71. The accused's right of confrontation was separate from the right to cross-examine the witness. *Miller,* 531 N.E.2d at 470.

The Indiana legislature also provided protection for a child victim or witness under age 10 by allowing the child to testify via closed-circuit television when certain requirements are met. Ind.Code § 35–37–4–8. However, unlike Ind.Code § 35–37–4–6, Ind.Code § 35–37–4–8 does not require a court to hold a hearing or to give notice to an accused of his/her right to be present at any hearing which might be held to determine whether a child victim or witness to certain crimes should be permitted to testify outside the courtroom.

The *Miller,* 531 N.E.2d 466 case is distinguishable from the present case since *Miller* dealt with the admission of an out-of-court statement by a child victim under age 10 and was thus a case squarely within the parameters of the statute. In contrast, E.T. was over age 10 and the procedure at

issue here is the use of an opaque chalkboard screen stationed between the victim and Casada solely during direct examination, a procedure not specifically provided for by statute. The *Miller* case is further distinguishable since Ind.Code § 35–37–4–6 requires a pre-trial hearing be held before a trial court determines whether an out-of-court statement or video tape of a child victim's testimony may be admitted. While we rely upon the underlying public policy of this statute and Ind.Code § 35–37–4–8, the present case facts are more closely analogous to the closed circuit television testimony procedure provided for in Ind. Code § 35–37–4–8.

Although *Brady v. State* (1989), Ind. App., 540 N.E.2d 59, 65 (transfer pending), addressed the constitutionality and requirements of Ind.Code § 35–37–4–8, *Brady* is also distinguishable from the present fact situation. The facts of *Brady* fell squarely within the parameters of Ind.Code § 35–37–4–8. The sex abuse victim was under age 10 and her testimony was given via closed circuit television and via admission of an out-of-court video taped statement. In the present case, Ind.Code § 35–37–4–8 did not apply as E.T. was over age 10 and a chalkboard screen was used. In addition, no issue of effective cross-examination arose here since the chalkboard was removed before Casada cross-examined E.T. Therefore, we need not discuss Ind.Code § 35–37–4–8 in terms of its applicability to this case, since it is the policy underlying the statute upon which we rely.

In the present case, the trial court ordered that a 6' × 4' chalkboard be placed between E.T., the complaining child witness, and Casada. The trial court gave that order only after E.T. had taken the witness stand during direct examination by the State and had become so distraught that she could not testify. The chalkboard was specifically designed to enable E.T. to avoid viewing Casada just as the screen at issue in *Coy* was designed to do. *Coy* held that the sixth amendment confrontation clause provides a criminal defendant the right to be confronted by a witness against him. *Miller*, 531 N.E.2d at 470 and *Miller*, 517 N.E.2d at 71, have recognized that an accused has a right to face-to-face confrontation under the federal and state constitutions, respectively. Casada had a right to have E.T. confront him face-to-face during her testimony. That right was violated when the chalkboard was placed between E.T. and Casada during direct examination. The violation of Casada's right was exactly the same right which the United States Supreme Court held was violated in *Coy*.

Although the face-to-face confrontation could not guarantee that E.T. would look at Casada and Casada had no right to compel E.T. to look at him, Casada would at least have had an opportunity for the trier of fact to evaluate E.T.'s reactions to facing Casada during her testimony had the chalkboard not been placed between them. Casada's right to confront E.T. and cross-examine her was separate from his right to be faced by E.T. Therefore, the trial court could not cure the violation of Casada's right merely by removing the chalkboard during cross-examination and redirect examination. The removal of the chalkboard merely facilitated Casada's exercise of his right to cross-examine E.T.

## II.

Justice Scalia, writing also for three other justices, refused to state whether any exceptions exist "to the irreducible literal meaning of the confrontation clause: 'a right to *meet face to face* all those who appear and give evidence *at trial*'", *Coy*, —— U.S. at ——, 108 S.Ct. at 2803, 101 L.Ed.2d at 867 (citation omitted, emphasis in original). If any exceptions exist, he stated, "they would surely be allowed only when necessary to further an important public policy." *Id.* Writing for five other justices besides himself, Justice Scalia, furthermore, held that a generalized finding that an exception to the face-to-face confrontation clause should apply would never be adequate to protect an accused's confrontation right. Specifically, the lack of individualized findings, that the child witnesses in the *Coy* case would suffer trauma if required to face Coy, violated Coy's right to confrontation. Justice O'Connor and Justice White joined in the majority

decision in *Coy*, but wrote that the protection of child witnesses from the trauma of facing an accused is a public policy compelling enough to override an accused's right to a face-to-face confrontation. Such a policy has already been recognized by a substantial majority of the states, Justice O'Connor noted. Provided a court finds on an individualized basis the need to protect a particular child victim of sexual abuse from the trauma of testifying face-to-face with a defendant at trial, the defendant's right to confrontation may be outweighed, according to Justices O'Connor and White. —— U.S. at ——, 108 S.Ct. at 2805, 101 L.Ed.2d at 869.

The Indiana legislature has expressed the compelling public policy of prosecuting individuals who sexually abuse children under the age of sixteen (16). Ind.Code § 35–42–4–3. The legislature has also expressed its objective of reducing the trauma for child victims in sexual abuse cases and in easing the task of prosecuting the perpetrators, while preserving a defendant's right to confrontation, by enacting Ind.Code § 35–37–4–6, *Miller*, 531 N.E.2d at 469, and by enacting Ind.Code § 35–37–4–8, *Brady*, 540 N.E.2d at 65. Furthermore, the Indiana legislature has provided protection on an individualized basis for child witnesses. Both of the above statutes require a particularized finding of need for a child either to testify by closed-circuit television or to present testimony via an out-of-court statement or video tape.

As discussed above, E.T. unquestionably did not fit within the parameters of the Indiana statutes since she was age 12 at the time of the purported molestation and age 13 at the time of Casada's trial. Of course, the use of a chalkboard screen during direct examination is also not squarely addressed by either statute. However, the statutory provisions for the particularized findings which a trial court must make do express the legislative objective of avoiding trauma to young victims of sex crimes and provide relevant guidelines for the findings which a court in the present situation should be expected to make. A trial court may base its finding on a psychiatrist's certification that a child's participation in the trial or testifying in the courtroom would be a traumatic experience for the child.[3] A trial court may also base its finding on a physician's certification that a child cannot be present in the courtroom or participate in the trial for medical reasons.[4] Finally, in the case of a trial court finding that a child's testimony should be given via closed-circuit television because a child's testifying in the courtroom would be a traumatic experience for the child, a trial court may consider "other evidence" which has been introduced concerning the effect of the child's testifying in the courtroom.[5]

The Maryland Court of Special Appeals elaborated on the "other evidence" which a trial court should consider and the findings which a trial court should make on the record. In *Craig v. State* (1988), 76 Md. App. 250, 544 A.2d 784, where a child molestation victim testified via closed circuit television under a Maryland statute, the court stated that expert testimony about potential trauma to a child might not always be necessary. *Id.* at 284, 544 A.2d at 801. On the other hand, the court stated that "a judge's subjective and self-justifying recollections of a child's demeanor, absent support in the record will not be enough to justify a finding that limits the right of confrontations [sic]." *Id.* The court noted that between those two extremes many possible ways of presenting evidence of potential trauma to a child exist. The court gave examples of a parent's testimony or a child's own testimony as evidentiary sources. The court emphasized that ordinarily the trial judge should observe and question the child. The court then quoted *Wildermuth v. State* (1987), 310 Md. 496, 523–24, 530 A.2d 275, 289: "[T]estimony about the likely impact on the particular child must be specific and must

---

**3.** Ind.Code § 35–37–4–6(c)(2)(B)(i); Ind.Code § 35–37–4–8(d)(1)(C)(i).

**4.** Ind.Code § 35–37–4–6(c)(2)(B)(ii); Ind.Code § 35–37–4–8(d)(1)(C)(ii).

**5.** Ind.Code § 35–37–4–8(d)(1)(C)(iii).

show much more than mere nervousness or excitement or some reluctance to testify." *Craig*, 76 Md.App. at 285, 544 A.2d at 801. The *Craig* court held that the standard for the trial court's finding should be whether a child witness would be so traumatized by a face-to-face confrontation as to be unable to reasonably communicate. *Id.* at 280–81, 544 A.2d at 799.

■ We are persuaded by these opinions of the Maryland Court of Special Appeals and consider them along with the Indiana legislature's expression in the above-mentioned statutory provisions in order to clarify the standard and the evidentiary sources to be used by a trial court weighing a defendant's right to confront his accusers against the public's interest in protecting child witnesses from traumatic courtroom experiences in situations where a child is older than the statutory age limit provided in Ind.Code § 35–37–4–6 and § 35–37–4–8. A trial court should make an individualized finding about a particular child witness, preferably after a hearing outside the jury's presence, using as a standard whether a child witness would be so traumatized by a face-to-face confrontation as to be unable to reasonably communicate. Whenever possible, the trial judge should observe and question the child. The trial court may consider a child's own testimony, a parent's testimony, a psychiatrist's or physician's testimony and any other expert or lay opinion or other evidence when weighing the potential trauma to a child who testifies in a courtroom while facing an adult defendant against that defendant's constitutional rights to be confronted by and to confront the child.

In the present case, after a recess during which the 6' × 4' chalkboard was placed between E.T. and Casada, the trial court went on record to describe the placement of the chalkboard and to hear objections and arguments about its placement from counsel. The court then made the following finding of the need for the chalkboard placement: "The record should reflect that the reason we took a recess was because the witness became distraught on the stand and when [sic] was unable to continue and

it is hoped that use of this screen will enable the witness to testify." Record at 100.

Although the trial court did base its finding on its own observations of E.T., the court received no evidence to support its finding and mentioned no evidence indicating that testifying would be traumatic for E.T., other than its personal observation that E.T. was "distraught on the witness stand" and "unable to continue." Record at 100. Such evidence was not a particularized finding that E.T., even after a court recess, would be so traumatized by confronting Casada in a courtroom that she would be unable to reasonably communicate on the witness stand. Without a particularized finding, the trial court could not outweigh Casada's right to be confronted face-to-face by E.T.

■ If, as it did in *Brady*, the record in the present case had shown that the trial court made particularized findings supported by the record that E.T. was too traumatized to testify while facing Casada in an open courtroom at trial, perhaps we could have supported the chalkboard screen placement. Although such a procedure was not specifically provided for by statute, we believe that a trial court should have the discretion to permit such a procedure in an appropriate situation. We do not read Ind.Code § 35–37–4–6 and Ind. Code § 35–37–4–8 as containing language limiting the application of protective procedures to the use of out-of-court statements, video taped statements, or closed-circuit television. Nor do we read the legislative intent underlying these statutes as prohibiting a court from protecting a child age 10 or older provided that the record shows a proper evidentiary basis and the court's particularized findings of need. We must emphasize that our holding is a narrow one addressing only the need for protection of child victims of sexual abuse. We must also reemphasize that a victim's mere nervousness is not sufficient to constitute a particularized finding of the need to avoid confrontation with an accused which would be sufficient to outweigh a defendant's con-

stitutionally protected right to be physically confronted by a witness against him.

### III.

■ The Supreme Court in *Coy*, —— U.S. at ——, 108 S.Ct. at 2803, 101 L.Ed.2d at 867, held that denial of a defendant's sixth amendment face-to-face confrontation right is subject to a harmless error analysis under the standard of *Chapman v. California* (1967), 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 709. Such an analysis cannot consider whether a witness's testimony would have been unchanged, or the jury's assessment unaltered had there been face-to-face confrontation. Harmlessness must be determined solely on the basis of the remaining evidence. The Indiana Supreme Court similarly held in *Brewster v. State* (1983), Ind., 450 N.E.2d 507, stating that, "A denial of the right of confrontation can be harmless error where there is evidence for conviction that is so convincing that a jury could not properly find otherwise." *Id.* at 510.

The *Chapman* standard requires us to determine whether the evidence other than E.T.'s testimony was so overwhelming that we are convinced the violation of Casada's right to face-to-face confrontation did not contribute to the jury's finding of guilt. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710. *Chapman* also requires that federal law be used in assessing harmlessness when a federally guaranteed right is involved. *Id.* at 21–22, 87 S.Ct. at 826, 17 L.Ed.2d at 709. Harmlessness is more difficult to establish when the prosecution has relied on circumstantial evidence. *See Harrington v. California* (1969), 395 U.S. 250, 254, 89 S.Ct. 1726, 1729, 23 L.Ed.2d 284, 288. In *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674, 686–87, a case involving the improper denial of adequate cross-examination, the Court listed the following factors for assessing harmlessness: the importance of the witness' testimony in the prosecutor's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Id.*

■ In the present case, E.T.'s testimony was key to the prosecutor's case. There was no other direct evidence of the material elements of the attempted molestation. The remaining evidence, from a director of special education at E.T.'s school, E.T.'s stepmother, a doctor and a nurse who examined E.T., and a medical expert regarding sexually abused children, was all circumstantial. The remaining evidence was persuasive, but not so overwhelming that it can be said beyond a reasonable doubt that permitting E.T. to give her direct examination testimony from behind a screen did not contribute to the jury's finding of guilt. Casada was permitted to cross-examine E.T. after the chalkboard was removed. We have already indicated that the cross-examination did not cure the violation of Casada's right to confront E.T. We also find that cross-examination did not render the violation harmless. The trial court's error in permitting the chalkboard placement during E.T.'s direct examination was not a harmless error.

*Issue Two*

Casada claims that the trial court erred in admitting polygraph examination reports, graphs and opinions over Casada's motion to suppress evidence, motion in limine, and trial objections. He contends that, as the polygraph examination was arranged by the prosecuting attorney and the prosecuting attorney and Casada, *pro se*, stipulated in writing to the admissibility of the polygraph results before Casada was advised of his constitutional right to counsel or waived his right to counsel, Casada's sixth amendment right to counsel was violated and the results should have been suppressed or excluded from admission into evidence.

■ The sixth amendment, through the fourteenth amendment of the United States Constitution, and article 1 § 13 of the Indiana Constitution provide an accused the right to counsel during a criminal proceeding or at a critical stage, whichever is

earlier. The right to counsel does not attach until judicial adversarial proceedings, such as arrest or the filing of an affidavit or indictment, have begun. *Kirby v. Illinois* (1972), 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411, 417; *Winston v. State* (1975), 263 Ind. 8, 11, 323 N.E.2d 228, 230; *Steward v. State* (1982), Ind. App., 436 N.E.2d 859, 861, *trans. denied.*

■ The results of a polygraph examination are not competent evidence and are inadmissible in a criminal prosecution absent a proper waiver or stipulation by the defendant and the prosecuting attorney. *Pavone v. State* (1980), 273 Ind. 162, 164, 402 N.E.2d 976, 978 (citing *Tope v. State* (1977), 266 Ind. 239, 246, 362 N.E.2d 137, 142 *cert. denied* 434 U.S. 869, 98 S.Ct. 209, 54 L.Ed.2d 146 (1977)). In *Owens v. State* (1978), 176 Ind.App. 1, 3–4, 373 N.E.2d 913, 915, we adopted prerequisites set out by the Supreme Court of Arizona, *State of Arizona v. Valdez* (1962), 91 Ariz. 274, 283, 371 P.2d 894, 900, in order for the results of a polygraph test to be admitted into evidence. The first condition is "that the county attorney, defendant and his counsel [2] all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state." Footnote [2] of *Owens* states, "the defendant's counsel would be required to sign the stipulation only when a defendant's 6th amendment right to counsel has already attached and where the defendant has not waived such right to counsel." *Owens*, 176 Ind.App. at 3, 373 N.E.2d at 915.

■ Casada's sixth amendment right to counsel, because an adversarial proceeding had commenced, had not attached at the time of the stipulation agreement since Casada had not been arrested, arraigned or indicted at that time. Therefore, under the *Owens* rule, only Casada and the prosecuting attorney were necessary parties to the stipulation agreement.

■ Even though an accused's sixth amendment right to counsel arising from an adversarial proceeding has not yet attached, an accused may have the right to counsel. Also, under the sixth amendment, as applied to the state through the fourteenth amendment, an accused has the right to assistance of counsel at any stage of the prosecution where counsel's absence might derogate his right to a fair trial. *Manley v. State* (1980), Ind.App., 410 N.E.2d 1338, 1342 (citing *United States v. Wade* (1967), 388 U.S. 218, 226,- 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149, 1157.) Such a stage is a "critical stage", and is any stage where (1) incrimination may occur or (2) where the opportunity for effective defense must be seized or be forgone. *Manley*, 410 N.E.2d at 1342. Polygraph examinations and post-test interrogations constitute critical stages in proceedings and thus trigger the sixth amendment right to counsel. *Greenlee v. State* (1985), Ind.App., 477 N.E.2d 917, 920. A defendant may waive his right to counsel, however. *Hatcher v. State* (1981), 275 Ind. 49, 52–53, 414 N.E.2d 561, 564. The waiver must be shown on the record to have been knowingly, voluntarily and intelligently made. *Id.* at 53, 414 N.E.2d at 564–65.

Casada relies on *Greenlee* and argues that the signing of the stipulation agreement itself constitutes a critical stage and that he should have been advised of his right to counsel before signing the agreement. However, *Greenlee* holds only that polygraph examinations and post-test interrogations constitute critical stages. Casada cites no other case support for his proposition and we have been unable to locate any. Therefore, we will consider whether the signing of the stipulation is a stage which meets the definition of a critical stage. As indicated above, one definition of a critical stage is a stage where incrimination may occur. The stipulation agreement signed by Casada contained no factual admissions. We find that no incrimination occurred when Casada merely signed the agreement. Incrimination could have occurred, if at all, only when Casada actually submitted to the polygraph examination and answered the examiner's questions.

The second definition of a critical stage is a stage where the opportunity for effective

defense must be seized or be forgone. Casada urges that he lost an opportunity for effective defense by not being advised of his right to counsel prior to signing the stipulation. He points out that had he had counsel, his counsel might have advised him not to sign the stipulation agreeing that polygraph results could be used at trial. In absence of the agreement, the results would have been inadmissible at trial.

■ Casada may be correct in believing that counsel might have dissuaded him from signing a stipulation agreement. Nevertheless, the possibility that such advice might have been given does not turn the signing of the stipulation agreement into a stage where the opportunity for effective defense must be seized lest the opportunity be lost. Immediately after Casada signed the stipulation agreement, the polygraph examiner advised Casada of his *Miranda* rights, by reading each right to Casada and then permitting Casada to read them. The polygraph examiner then went over the terms of the stipulation agreement with Casada again and the examiner signed the agreement as a witness. Thus, Casada was fully advised of his right to counsel and his right to remain silent prior to the commencement of the polygraph examination. Had Casada requested counsel at that point, his counsel still could have effectively defended him by advising Casada not to take the examination or to remain silent during questioning. Casada's full awareness, before he took the examination, of his right to counsel and his failure to exercise that right constituted a clear waiver of it.

In summary, the signing of an agreement stipulating to the admissibility of polygraph results was not a critical stage under this set of facts since it was not a stage where incrimination might have occurred or where the opportunity for effective defense must have been seized or forgone. Casada's lack of counsel at the signing of the stipulation agreement did not derogate his right to a fair trial. Also, under these facts Casada's sixth amendment right to counsel had not attached

generally, since he had not yet been arrested, arraigned, or indicted. Thus, Casada's constitutional right to counsel under the sixth amendment and under article 1 § 13 of the Indiana Constitution was not violated and the results of and opinions about the polygraph examination were admissible into evidence at the trial court's discretion.

Judgment reversed and cause remanded for a new trial.

SHIELDS, P.J., and BAKER, J., concur.