James R. WILLEY, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 06S00–9712–CR–654.

Supreme Court of Indiana.

June 17, 1999.

**436**

Deborah K. Smith, Thorntown, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Kimberly MacDonald, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

A jury convicted James R. Willey of felony murder, involuntary manslaughter, conspiracy to commit aggravated battery, conspiracy to commit burglary as a Class A felony, and burglary as a Class A felony. Three of the counts were "merged" into the remaining two at sentencing, and Willey was sentenced to consecutive terms of fifty years for conspiracy to commit burglary and sixty-five years for felony murder.

In this direct appeal, Willey contends that: (1) the trial court erred in admitting testimony regarding the results of a polygraph examination; (2) the statement he gave to police should have been suppressed as involuntary; (3) the trial court erred in allowing hearsay statements by several witnesses regarding threats that Willey had made to the victim and her fear of him; (4) the admission of several autopsy photographs of the victim constitutes fundamental error; (5) his dual convictions and sentences for felony murder and conspiracy to commit burglary violate federal double jeopardy; and (6) the trial court improperly found two aggravating circumstances at sentencing. We affirm the convictions and sentence.

### Factual and Procedural Background

On March 12, 1997, Willey left Indiana for Florida where he stayed with his aunt. Eight days later, Janice Willey's body was found in her garage by her son. She had been smothered, strangled and beaten with a sledgehammer. Janice and Willey were married in 1963 and divorced in 1987. Shortly after the divorce, Willey returned to the resi-

dence and the two lived together until the fall of 1996 when Willey moved out of the home at Janice's request. Willey retained a key to the home and returned virtually every day until Janice started using a deadbolt in early 1997.

On March 23, 1997, police investigating Janice's death spoke with Roger Barnard, a friend of Willey's. The following day, when police attempted to speak with him again, Barnard shot and killed himself in the parking lot of a tavern.

On March 25, a Florida police officer spoke with Willey at the request of Indiana authorities. The officer told Willey that Barnard had shot himself and had implicated Willey in Janice's death before he died. In fact, Barnard had said nothing about Willey. The officer asked Willey if he would be willing to take a polygraph examination and Willey replied that he would submit to a polygraph in either Florida or Indiana, whichever the police preferred. The next day several Indiana State and Boone County police officials flew to Florida to meet with Willey.

Willey agreed to meet with the officers at a Florida police station to give a statement and take a polygraph examination. At the station, the polygraph examiner, a reserve officer of the Boone County Sheriff's Department, orally advised Willey of his Miranda rights and also gave him a written "Advice of Rights—Interrogation" form, which recited the Miranda rights and also included a waiver of the right to remain silent and the right to legal counsel. Willey signed the form after reading it. He also read and signed a "Polygraph Waiver" which also included a statement of Miranda rights. Willey signed a third document entitled "Stipulation" stating that he waived his privilege against self-incrimination as to information resulting from the polygraph examination. The stipulation was orally reviewed point-by-point and signed by Willey. Willey declined the opportunity to have the interview recorded in audio or video.

In the polygraph interview Willey denied involvement in Janice's death. The polygraph certified examiner, Officer Klingler, after discussing the exam with Boone County Sheriff Hudson, who was also polygraph certified, concluded that the test indicated deception. He then confronted Willey with his interpretation and asked Willey how it occurred. Willey initially made some admissions, and after individual questioning by the other officers over the next few hours agreed to make a statement at about 10:00 p.m. He was given the option of writing or typing the statement himself, but asked Boone County Sheriff Hudson to type it for him. Willey then gave a statement that in substance admitted to an agreement with Barnard to "rough up" Janice while Willey was in Florida. Willey also admitted to giving Barnard $7,000 in cash, some guns, and a watch "to hold for me ... while I was in Florida."[1]

According to Hudson, Willey appeared to be alert and coherent and to understand everything that was happening at the time he signed the statement. Hudson reviewed Willey's Miranda rights before beginning the statement, read each paragraph to Willey

---

1. The statement reads as follows:
1. I have engaged in several conversations with Roger Barnard, my best friend, who works at Drew Corp. and who lives on St. Claire Street in Mooresville, Indiana, about Roger going to my old residence, 1195 Bloor Lane, Zionsville, to personally injure my ex-wife, Janice Willey.
2. Further, that I knowingly participated in this activity and was a willing partner to Roger inflicting bodily injury to Janice Willey.
3. Roger and I both agreed that this crime would be carried out while I was in Florida. I told him that she would normally be home on Wednesday nights, and that I knew, before this crime took place that it was going to occur on Wednesday night.
4. Roger told me he was going to be inside the garage when she came home from work, and that's when he was going to beat her up. It was supposed to be where he would rough her up.
5. I made sure that my whereabouts could be accounted for while I was in Florida, during last Wednesday night, so I could not be blamed for this.
6. I gave Roger 70 $100.00 bills for a total of $7,000.00 to hold for me just before I left to go to Florida. I also gave him a Gold Bulova wrist watch to hold. Additionally, I gave him some handguns and rifles to hold for me. The cash was in a plain white envelope sealed.
7. I have threatened Janice before.
8. I was mad at Janice because she booted me out last November, 1996.
9. The night before I left for Florida, Roger told me he would carry this out.

"word-for-word" after it was typed, and had Willey read and initial each paragraph after the entire statement was typed.

Several days later the police transported Willey to Indiana. At that time Willey was again advised of his Miranda rights and agreed to talk to the transporting officers. When asked if the written statement was true, Willey stated that it was. Willey was also asked about each point in his typewritten statement to police and agreed that each was true. Willey also volunteered that "[i]f I just wanted [Janice's] ass kicked, I would have done it myself."

Willey was charged with conspiracy to commit aggravated battery, conspiracy to commit burglary as a Class A felony, involuntary manslaughter, felony murder, and burglary as a Class A felony. He filed a pretrial motion to suppress his statement to police and all evidence pertaining to the polygraph examination. Both motions were denied after a hearing. A jury found Willey guilty of all charges.

## I. Admissibility of Polygraph Results

In his pretrial "Motion to Suppress and Exclude All Evidence Pertaining to Polygraph Examination," Willey raised several grounds for the inadmissibility of "all evidence" relating to the polygraph examination.[2] At trial Willey did not object to much of the polygraph examiner's testimony, including the questions asked and the answers given. But when the State asked the polygraph examiner if he arrived "at a determination—as to whether or not the Defendant had told the truth on the relevant questions," Willey objected on the ground that the stipulation did not permit the trial court or jury to hear the results of the polygraph test.

■ As this Court recently observed in *Sanchez v. State,* 675 N.E.2d 306, 308 (Ind. 1996), there are four prerequisites to the admission of polygraph results: (1) the prosecution, defendant, and defense counsel[3] must all sign a written stipulation providing for the defendant's submission to the examination and for the subsequent admission at trial of the results; (2) notwithstanding that stipulation, the admissibility of the test results is at the trial court's discretion regarding the examiner's qualifications and the test conditions; (3) the opposing party shall have the right to cross-examine the examiner if his or her graphs and opinion are offered into evidence; (4) the jury be instructed that, at most, the examiner's testimony tends only to show whether the defendant was being truthful at the time of the examination, and that it is for the jury to determine the weight and effect to be given to the examiner's testimo-

2. These included (a) Willey was without advice of counsel; (b) he "received no explanation of the law of evidence in the State of Indiana as it relates to polygraph examinations"; (c) the theory of operating the polygraph or its reliability was not explained to him; (d) Willey "received no advice as to whether he should or should not sign the Stipulation"; (e) his "willingness to take the polygraph was solicited under circumstances which involved blatant deception on the part of an agent of the State"; (f) Willey was not apprised that he was a suspect in Janice's murder; (g) the language of the stipulation is "confusing" and contains conflicting provisions; (h) the stipulation was not approved by his attorney and should not be binding on his attorney; (i) the stipulation is contrary to law because "it attempts to provide for admissibility of some evidence while not providing for admissibility of the actual charts"; (j) Willey was not informed or educated about the polygraph such that he could "make an intelligent decision as to whether he should sign the Stipulation"; (k) the stipulation "does not specifically state that either the Defendant or the Prosecuting Attorney agreed to the admission into evidence of the polygraph test results, particularly the Examiner's opinion on the issue of deception"; and (*l*) the stipulation "does not specify the forum or purpose of 'admissibility,'" i.e., it "does not specifically provide that the matter covered may be admitted at trial and presented to a jury."

3. This Court's opinion in *Sanchez* does not specifically note the role of defense counsel in the stipulation before it. However, the Court of Appeals found that "the stipulation was signed by the appropriate parties inasmuch as Sanchez was not represented by counsel at the time." *Sanchez v. State,* 650 N.E.2d 734, 736 (Ind.Ct. App.1995). Other cases have upheld stipulations signed by a defendant before the Sixth Amendment or Article I § 13 right to counsel has attached. *See, e.g., Atkinson v. State,* 581 N.E.2d 1247, 1250 (Ind.1991); *Casada v. State,* 544 N.E.2d 189, 198 (Ind.Ct.App.1989), *called into doubt by Callis v. State,* 684 N.E.2d 233, 238 (Ind.Ct.App.1997). Because we find the stipulation unenforceable for other reasons, we need not address Willey's claim that counsel's signature is required.

ny. The stipulation contained the following eight paragraphs:

1. The above-named individual has requested that he be given a polygraph examination by a qualified Boone County Law Enforcement Officer.

2. That Pamela Buchanan, Prosecuting Attorney, consents to said polygraph examination.

3. That the examiner will be competent polygraph examiner and qualified by his education, training and experience to testify as an expert witness in interpreting the results of the polygraph examination performed by him and the use of the polygraph as a means of detection of deception.

4. That the questions of the examiner, the answers by the individual any interrogation or other things relating to said examination, may be admitted as evidence, either on behalf of the State of Indiana or on behalf of the individual, subject to the discretion of the Court trying such case.

5. That the above-named individual hereby waives his constitutional privilege against self-incrimination to the extent that the same may be involved in the presentation of evidence in the foregoing matters.

6. The above-named individual also understands that without his consent to the use of these test results, said test results would otherwise be inadmissible.

7. The defendant's polygraph chart recordings, the examiner's various work sheets and all questions other than the relevant test questions are not to be introduced into evidence.

8. It is further understood by all parties that upon signing this Agreement and Stipulation, it is not only binding upon them individually; but upon all further parties and their successors in interest, i.e. such other counsel as the State or the defendant may retain or employ for any trial or hearing involving this indictment.

 The stipulation is a contract between the State and Willey. *Atkinson v. State*, 581 N.E.2d 1247, 1250 (Ind.1991). Contract law principles therefore control its use and interpretation, including the well settled doctrine that an ambiguity is to be construed against the party who prepared the contract. *See Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1132 (Ind.1995); *Rosenbaum Bros. v. Nowak Milling Corp.*, 222 Ind. 108, 112, 51 N.E.2d 623, 624 (1943). Sheriff Hudson testified that he took a copy of a polygraph stipulation from an adjoining county with him to Florida and called the Boone County Prosecutor's officer for further instruction. After typing the stipulation from this form he faxed it to the prosecutor's office for its approval before presenting it to Willey. Willey took no part in the preparation of the stipulation, asked no questions about it, and made no changes to it. Accordingly, any ambiguity in the stipulation is to be construed against the State.

 Paragraph four of the stipulation plainly and unambiguously allows the admission of the examiner's relevant test questions and Willey's answers, and these were not objected to at trial. Rather, Willey's objection was to the examiner's opinion as to Willey's truthfulness. The stipulation is ambiguous on this point. *See USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind.1997) (a contract "is ambiguous only if it is 'susceptible to more than one interpretation and reasonably intelligent persons would differ as to its meaning'") (quoting *Commercial Union Ins. v. Moore*, 663 N.E.2d 179, 181 (Ind.Ct.App.1996)); *Haxton v. McClure Oil Corp.*, 697 N.E.2d 1277, 1280 (Ind.Ct.App.1998) ("A contract is ambiguous if reasonable people would find it subject to more than one interpretation."). The State points to paragraph four, which provides that "the questions of the examiner, the answers by the individual [and] any interrogation or other things relating to said examination, may be admitted as evidence...." However, in the context of a polygraph stipulation entered into without the assistance of counsel, "other things" is too vague to alert a reasonable defendant that the polygraph examiner will be permitted to give an opinion that the defendant was deceptive or a liar. The ambiguity of paragraph four is further compounded by other paragraphs. Paragraph three specifically provides that "the examiner will be a competent polygraph examiner and

qualified by his education, training and experience to testify as an expert witness in interpreting the results of the polygraph examination," but it does not spell out that this testimony might be offered in court against the defendant, or that "interpreting the results" may include an opinion as to truthfulness. Moreover, paragraph seven explicitly excludes from introduction into evidence at trial what a reasonable person might believe to be at least part of the polygraph "results," the polygraph chart recordings and examiner's worksheets. *Cf. Sisson v. State,* 181 Ga.App. 784, 353 S.E.2d 836, 838 (1987) (" 'The results' of a lie detector test can be interpreted to be (1) the charts resulting from a graphing of the responses of the person tested, and/or (2) the opinion of the expert based on those charts.").

Other Indiana cases provide examples of stipulations that unambiguously provide for the admission of a polygraph examiner's opinion testimony regarding the defendant's truthfulness in answering questions. *See, e.g., Willis v. State,* 268 Ind. 269, 273, 374 N.E.2d 520, 523 (1978) (stipulation provided "any interrogation or other things related to said examination including the results and the opinions of the examiner relating to said examination, be admitted as evidence"); *Taylor v. State,* 409 N.E.2d 1246, 1249–50 (Ind. Ct.App.1980) ("I UNDERSTAND FURTHER that the results of this polygraph (lie detector) test may be used in court against me or for me, that it may become an exhibit in any trial in which I may be involved. I FURTHER STIPULATE, UNDERSTAND AND AGREE that the person administering said polygraph (lie detector) test, may explain, analyze or discuss all or any portion of said test in open court. . . ."). This stipulation does not.

■ In addition to failing the *Sanchez* test requirement that the stipulation provide for "admission at trial of the [polygraph] results," there is a separate and equally serious problem with admissibility of this examiner's opinion. Willey submitted to the polygraph after being informed, falsely, that Barnard had implicated him in the crime. It is true, as the State points out, that police deception does not vitiate a Miranda waiver and render

a confession inadmissible, but is rather one consideration that must be viewed in determining the "totality of the circumstances." *See, e.g., Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *Ward v. State,* 408 N.E.2d 140, 143 (Ind.Ct.App. 1980). This is based in significant part on the view that the confession is easily understood by even the most limited suspect to be a serious act and one that potentially has severe adverse consequences. One does not easily suppose that a false confession will be elicited by a false report of an accusation. The admissibility of a confession is predicated on its reliability, not on an agreement that it may be admitted.

■ The same is not true of a stipulation to take a lie detector test. Viewed as a matter of contract, the stipulation is based on a misrepresentation of fact. One can easily imagine that an innocent suspect, confronted with a false report that a perpetrator had implicated the suspect, would agree to a lie detector test in the belief that it would exonerate the suspect. Moreover, the product of the deception does not share the reliability of a confession. Indeed, the courts of this state have repeatedly and correctly expressed severe reservations about the reliability of polygraph results. *See, e.g., Madison v. State,* 534 N.E.2d 702, 704 (Ind.1989) ("the value of polygraph examinations is highly questionable . . ."); *Reid v. State,* 267 Ind. 555, 559, 372 N.E.2d 1149, 1152 (1978) ("in any given case, unreliable results may be produced in a polygraph test by influences that cannot be controlled or compensated for by a competent examiner"); *Vacendak v. State,* 264 Ind. 101, 110, 340 N.E.2d 352, 357 (1976) ("the degree of accuracy of these tests, currently rated at eighty percent, is not sufficiently accurate to mandate their admission on the question of guilt or innocence") (footnote omitted); *Sauzer–Johnsen v. Sauzer,* 544 N.E.2d 564, 569 (Ind.Ct.App.1989) ("Polygraphs are inherently unreliable."). In order for this evidence to be admissible, it must be agreed to in unambiguous terms and the stipulation agreement, like any other contract, must not be the product of misrepresentation or mistake of fact. *See, e.g., Park 100 Investors, Inc. v. Kartes,* 650 N.E.2d 347,

349 (Ind.Ct.App.1995) ("where one employs misrepresentation to induce a party's obligation under a contract, one cannot bind the party to the terms of the agreement"); *Martin Bros. Box Co. v. Orem,* 117 Ind.App. 110, 112, 69 N.E.2d 605, 605–06 (1946) ("where there is any mistake of the contracting parties by which one of them has in mind one thing as the subject matter of the contract and the other party has in mind something entirely different, and the terms of the contract are such that it will mean either the one or the other, there is no meeting of the minds, and therefore no contract").

■ Even though the trial court erred when it allowed this testimony, the error is harmless "if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." *Fleener v. State,* 656 N.E.2d 1140, 1142 (Ind.1995); Ind. Trial Rule 61. Willey admitted his involvement in an agreement with Barnard to harm his ex-wife in a detailed typewritten statement to police, *see supra* note 1, and subsequently told the police that "[i]f I just wanted [Janice's] ass kicked, I would have done it myself." Based on these statements, it is clear that Willey was not telling the truth when he denied any involvement in Janice's death. Equally important, taken at face value, Willey's own account of these events amounts to an admission that he conspired with Barnard to commit a burglary and was an accomplice to a felony murder. He concedes that he and Barnard agreed that Barnard would enter Janice's garage to commit a battery. Because that battery resulted in death, this is an admission to the felony murder and involuntary manslaughter charges. Because the polygraph examiner's testimony, at most, had a slight impact on the jury's verdict, we hold that its erroneous admission was harmless.

## II. Statement to Police

Willey also contends that the trial court erred when it denied his motion to suppress his statement to the police because (1) he did not receive proper *Miranda* warnings "throughout the interview process;" (2) he was not advised of the possible charges

against him; and (3) the statement was drafted by the police. Willey concedes that the language in the rights form that he read and signed complies with *Miranda,* but argues that the "one time reading" of the Miranda warnings shortly after 3:00 p.m. was not sufficient to properly advise him of his rights. He points to the events following the initial advisement and waiver of those rights. The polygraph examination lasted until approximately 6:00 p.m., and then the polygraph examiner discussed his conclusions with Willey and asked Willey for a possible explanation of his finding of deception between 6:30 and 7:40. Sheriff Hudson interviewed Willey from 7:50 to 8:30, followed by Detective Knox's interview from 8:40 to 9:20. Detective Crane next interviewed Willey from 9:30 to 9:55, and then Marshal Effler talked to Willey briefly. All of the investigators returned to the interview room at approximately 10:00 to finalize a statement from Willey. Sheriff Hudson asked Willey if he remembered being advised of his right to remain silent and the right to an attorney, and Willey stated that he did. The typewritten statement was then prepared, which Willey signed at 10:40 p.m.

■ The Miranda warnings need not be repeated "if the circumstances surrounding the interruption or adjournment of the process have not deprived the suspect of the opportunity to make an informed and intelligent assessment of his interests involved in the interrogation." *Heavrin v. State,* 675 N.E.2d 1075, 1081 (Ind.1996) (quoting *Shane v. State,* 615 N.E.2d 425, 427 (Ind.1993)). The rationale supporting this rule is that "if the interruption is part of a continual effort by the police to gather information from the suspect, there can be little doubt as to the suspect's interest in the matter." *Shane,* 615 N.E.2d at 427. Sheriff Hudson testified that Willey's demeanor and alertness remained the same throughout the questioning. Moreover, Willey did not leave the police station at any time. Rather, he was questioned continuously with a thirty minute break after the polygraph examination and ten minute breaks between interviews with each officer. Willey's interest remained clear throughout this process and there was no need for each

officer to readvise Willey of the Miranda warnings. *Id.*

■ Willey also asserts error based on the alleged failure of the police to notify him of the possible charges facing him. However, Willey testified at trial that Sheriff Hudson told him he could be charged with four or five different offenses, including murder. Moreover, there is no need to inform suspects of all potential charges before taking a statement because of innumerable unknown factors that may affect the resulting formal charges. *Armour v. State*, 479 N.E.2d 1294, 1298 (Ind.1985); *see also Allen v. State*, 686 N.E.2d 760, 773 (Ind.1997), *cert. denied*, — U.S. —, 119 S.Ct. 807, 142 L.Ed.2d 667 (1999) (rejecting contention that confession should be suppressed because investigating officers failed to notify defendant of the reasons for the interrogation) (citing *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)). Nor is Willey's confession rendered involuntary because a police officer typed it. Willey was given the option of writing or typing the statement himself, but requested that Sheriff Hudson type the statement for him. The Sheriff was thorough and patient in typing the statement. He read every word of each typed paragraph to Willey and asked whether it was correct before moving on to the next. After the statement was typed Willey initialed each paragraph and signed the statement twice.

In sum, none of these three bases asserted by Willey renders his statement involuntary.

### III. Admissibility of Hearsay Statements

Willey next argues that the trial court erred when it overruled several of his hearsay objections. Eight witnesses, including the Willeys' son, Willey's sister, a co-worker and close friends of Janice's, police officers and a psychologist testified that Janice had told them that she feared Willey and/or that

Willey had threatened to kill her. James Willey Jr. testified that he spoke with Janice shortly after a May 5, 1996 incident that resulted in police being called to his parent's home. He testified that his mother sounded afraid and upset. The State then asked if Janice told him "what was making her scared," and defense counsel objected based on hearsay. The trial court overruled the objection and the witness responded

[s]he said that he had threatened her life, that he would kill her and that she was scared and as a result she had packed her bags and had moved out. She had left. She had called 911 when things got too violent. I mean, she didn't say he had struck her, just that he had clearly threatened and she was afraid for her life and so she called 911, they responded, they escorted her out of the house and she left.

The testimony of the other seven witnesses is sufficiently similar to that quoted above that its admissibility stands or falls under the same analysis that applies to this statement.[4]

■ At trial, the State asserted that this testimony was admissible because it was offered to prove motive or intent, not the truth of the matter asserted. However, it is readily apparent that this testimony was offered to prove the matter asserted, specifically that Willey had threatened Janice. Therefore, it is hearsay and inadmissible unless one of the exceptions applies. Motive and intent of the defendant are potentially relevant to the admissibility of prior "bad acts" under Evidence Rule 404(b), but do not constitute an exception to the hearsay rule. On appeal, the State argues that this testimony falls under the state of mind exception to the hearsay rule: "These comments directly establish Janice's state of mind at the time she made the statements and demonstrate her fear of Defendant." *See* Ind. Evidence Rule 803(3).

---

4. For example, Phyllis Phenis testified that Janice told her in early May that Willey "had threatened to kill her, that she wasn't going to leave him, she wasn't going to leave the home and if she did she'd pay the price." When asked if Janice had told her of any "specific threats" made by Willey, Clare Wolf responded that Willey had "threatened her, that he would kill her.... At least a dozen times, it wasn't just

once." Zionsville police officer Jerry Harris recounted Janice's statement to him when he responded to the May 5 incident. Harris testified that Janice said, "You know the bastard is going to kill me." Finally, Willey's sister, Ruth Wilson, testified that "she said she was afraid. And I asked her why. And she said, '[b]ecause I'm afraid he's going to kill me.'"

In addition to the requirement that hearsay fall under an exception to be admissible, the Rules of Evidence also mandate that only relevant evidence is admissible. Evid. R. 402. This Court recently observed that a "victim's state of mind is relevant where it has been put in issue by the defendant." *Angleton v. State*, 686 N.E.2d 803, 809 (Ind. 1997) (citing *Taylor v. State*, 659 N.E.2d 535, 543 (Ind.1995)); *see also Lock v. State*, 567 N.E.2d 1155, 1159–60 (Ind.1991) (hearsay statements admissible to show the victim's state of mind, in part, because the relationship between the victim and defendant "was one of the contested issues at trial"); 13 ROBERT L. MILLER, JR., INDIANA PRACTICE § 803.103A at 613 (2d ed.1995) (admissibility under Rule 803(3) requires, among other things, that "the declarant's state of mind must be relevant to an issue in the case") (citing *United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir.1992)).

■ The record does not support the State's claim that Willey put in issue his relationship with Janice. During opening statement the prosecutor noted that the Willeys were divorced and read Willey's typewritten statement to the police, *see supra* note 1, which included the statements "I have threatened Janice before. I was mad at Janice because she booted me out last November 1996." Defense counsel's opening statement made no specific mention of the nature of the relationship between Willey and Janice. Rather, defense counsel merely stated that Willey "repudiates that statement in some respects and by that I mean to say he will testify and tell you that that statement, regardless of what it says, is not really accurate in all respects and he'll explain that to you." It was clear from the outset of the trial that the Willeys were divorced and that their relationship was strained. This is not a situation as in *Angleton*, where the "defendant put the victim's state of mind at issue by portraying her as a happily married wife

who peacefully spent her time writing love notes and poems for her husband." 686 N.E.2d at 809.

■ The State also asserts that Willey's alleged threats and Janice's fear of him were relevant because Willey testified at trial that he had not threatened Janice. These witnesses testified in the State's case in chief, before Willey took the stand. The State cannot bootstrap this evidence into admissibility by putting it in, forcing a denial, and then claiming it was put in issue by the defendant. In sum, because Janice's fear of Willey was not relevant to any issue in the case and Willey did not place her state of mind in issue, we hold that the trial court abused its discretion by allowing these witnesses to offer hearsay testimony regarding Willey's threats and Janice's fear of him.[5]

■ We disregard error in the admission of evidence unless it affects the substantial rights of a party. Ind. Trial Rule 61; *Fleener v. State*, 656 N.E.2d 1140, 1142 (Ind. 1995). An error will be found harmless if its probable impact on the jury, in light of all the evidence in the case, is sufficiently minor that it did not affect the substantial rights of a party. *Id.* For the same reasons described in Part I., *supra*, the erroneous admission of this testimony was harmless error.

## IV. Admission of Photographs

■ Willey contends that the trial court erred by admitting several autopsy photographs that showed the victim's body in an altered condition. Three of these photographs showed the interior of the victim's skull and one showed the pathologist's gloved hands holding the brain. Because Willey did not object to these photographs at trial, any challenge is waived on appeal. *Woods v. State*, 677 N.E.2d 499, 504 (Ind.1997). Willey acknowledges the waiver but asserts that the admission of these photographs constitutes fundamental error.[6] In order to qualify as fundamental error, an error must be so prejudicial to the rights of the defendant as

5. At trial the State contended that hearsay statements offered through the testimony of Janice's psychologist fall under Evidence Rule 803(4) (statements for purposes of medical diagnosis or treatment). *See also McClain v. State* 675 N.E.2d 329 (Ind.1996). However, the State does not advance this argument on appeal. Accordingly,

it is waived. For the same reasons described in text above, the psychologist's testimony was inadmissible under Rule 803(3).

6. The State contends that the admission of the photographs was not error. However, as this Court recently observed in *Allen v. State*, 686

to make a fair trial impossible. *Sauerheber v. State,* 698 N.E.2d 796, 804 (Ind.1998) (citing *Barany v. State,* 658 N.E.2d 60, 64 (Ind. 1995)); *see also Wilson v. State,* 514 N.E.2d 282, 284 (Ind.1987) (to rise to the level of fundamental error, the error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process"). The admission of these photographs does not satisfy this lofty standard.

## V. Double Jeopardy

Willey next contends that the trial court erred when it sentenced him for both felony murder and conspiracy to commit burglary. Willey makes his argument under the federal "Double Jeopardy Clause which protects against ... multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)." He makes no argument under the Indiana Constitution.[7]

■ Federal double jeopardy claims are controlled by the "same elements" test set forth in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Games v. State,* 684 N.E.2d 466, 477 (Ind.1997), *reh'g granted in part,* 690 N.E.2d 211 (Ind.1997), *cert. denied* — U.S.——, 119 S.Ct. 98, 142 L.Ed.2d 78 (1998). In determining whether there are two offenses or one under *Blockburger,* the focus is on whether each statutory provision "requires proof of an additional fact which the other does not." 284 U.S. at 304, 52 S.Ct. 180. Willey was convicted of felony murder under Indiana Code § 35–42–1–1(2) and conspiracy to commit burglary under Indiana Code §§ 35–41–5–2 & 35–43–2–1. The felony murder charge required proof of a killing, which the conspiracy charge did not; the conspiracy charge required proof of an agreement to commit a felony, which the felony murder charge did not. Willey's convictions for felony murder and conspiracy to commit burglary do not violate the federal Double Jeopardy Clause. *Cf. Valentin v. State,* 688 N.E.2d 412 (Ind. 1997) (convictions for conspiracy to commit kidnaping and felony murder do not violate the federal Double Jeopardy Clause); *Grinstead v. State,* 684 N.E.2d 482, 486 (Ind.1997) (convictions for murder and conspiracy to commit murder present no federal double jeopardy violation).

## VI. Sentencing

■ The jury convicted Willey of five counts, but the trial court merged the sentences on three of those counts and sentenced Willey only for felony murder and conspiracy to commit burglary as a Class A felony.[8] The trial court found several aggravating factors when it sentenced Willey to maximum and consecutive sentences of fifty and sixty-five years. The factors uncontested on appeal include Willey's criminal

---

N.E.2d 760, 776 (Ind.1997), "autopsy photographs are generally inadmissible if they show the body in an altered condition." *Allen* cited *Loy v. State,* 436 N.E.2d 1125, 1128 (Ind.1982), which observed that "[s]uch a display may impute the handiwork of the physician to the accused assailant and thereby render the defendant responsible in the minds of the juror for the cuts, incisions, and indignity of an autopsy." The State argues that the pathologist testified that he had to examine the skull below the skin to realize the full extent of the injuries. However, this does not render any and all autopsy photographs admissible. The relevance and probative value of these photographs was minimal, at best, because the extent of Janice's injuries was not a contested issue at trial. Willey was in Florida at the time of the killings and was being tried as an accomplice for felony murder and other charges actually perpetrated by Barnard. The probative value of these photographs was substantially outweighed by the danger of unfair prejudice noted in *Loy. Cf. Fentress v. State,* 702 N.E.2d 721, 722 (Ind.1998) (autopsy photographs held admissible because pathologist testified that it was necessary to look under the skin to determine the extent of damage, which was probative of the defendant's intent to kill).

7. However, Willey does argue that the two sentences should "merge" and cites Indiana authority for the proposition that a defendant cannot be sentenced for both felony murder and the underlying felony. *See McCurry v. State,* 558 N.E.2d 817, 819 (Ind.1990); *Scott v. State,* 510 N.E.2d 170, 174 (Ind.1987). The trial court "merged" Willey's sentence for burglary, the underlying felony, and felony murder consistent with these authorities. The trial court was not required, as Willey suggests, to merge the sentences for felony murder and conspiracy to commit burglary based on these authorities or any other Indiana "merger" decisional law.

8. The trial court's oral pronouncement at the August 22 sentencing hearing was as follows: "on COUNT IV, MURDER, this Court sentences

history, which included a 1986 conviction for operating while intoxicated and a juvenile conviction for theft; the facts and circumstances of the crime, including that Willey instigated and initiated the crime; the duration of the conspiracy process and "the great care in the planning process;" and the brutality of the murder against a victim who was "physically infirmed." The trial court found no mitigating circumstances.

■ Willey contends the trial court improperly found as aggravating circumstances his lack of remorse and that a reduction in the sentence would depreciate the seriousness of the crime. We need not address these contentions because a single aggravating circumstance may be sufficient to support an enhanced sentence. *Thacker v. State,* 709 N.E.2d 3, 10 (Ind.1999); *Sweany v. State,* 607 N.E.2d 387, 391 (Ind.1993). If the trial court improperly applies an aggravator, but other valid aggravators exist, a sentence enhancement may still be upheld. *See Gibson v. State,* 702 N.E.2d 707, 710 (Ind.1998) (citing *Blanche v. State,* 690 N.E.2d 709, 715 (Ind.1998)). In light of the significant unchallenged aggravating circumstances, we find that the trial court did not abuse its discretion by imposing enhanced and consecutive sentences.

### Conclusion

James R. Willey's convictions and sentences are affirmed. This case is remanded for correction of the clerical errors explained in footnote 8.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.

you to the maximum term of sixty-five (65) years; on COUNT II, I believe, CONSPIRACY TO COMMIT BURGLARY, CLASS A FELONY, the Court sentences you to the maximum term of fifty (50) years; for a maximum consecutive term of one hundred and fifteen (115) years." Three days later the trial court signed an Abstract of Judgment that sentenced the defendant to fifty years for Count II and sixty-five years for Count V, burglary as a Class A felony. Five days later, the trial court issued its written sentencing order that was consistent with the Abstract of Judgment, but at odds with the oral pronouncement at the sentencing hearing.

The trial court's comments at sentencing clearly indicate that Counts I, III, and V merged into Counts II and IV and that it sentenced the defendant on the latter two counts. Based on the unambiguous nature of the trial court's oral sentencing pronouncement, we conclude that the Abstract of Judgment and Sentencing Order contain clerical errors and remand this case for correction of those errors.