## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 04 2015, 8:27 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Alan W. Roles
Coleman, Roles & Associates, PLLC
Louisville, Kentucky

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Leo John Conley,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 4, 2015

Court of Appeals Case No.
31A01-1404-CR-157

Appeal from the Harrison Superior Court

The Honorable Roger D. Davis, Judge

Trial Court Cause No.
31D01-1208-FA-570

**Brown, Judge.**

[1] Leo John Conley appeals his convictions for nineteen counts of child molesting as class A felonies and one count of child molesting as a class C felony. Conley raises four issues which we consolidate and restate as:

I. Whether the trial court abused its discretion by admitting the results of a polygraph examination;

II. Whether the court erred by denying Conley's motion for a mistrial; and

III. Whether the evidence is sufficient to sustain Conley's convictions for fifteen counts of child molesting as class A felonies.

We affirm.

## Facts and Procedural History

[2] In 2004, Conley, born in 1963, married the mother of N.P. At the time, N.P.'s mother did not have custody of N.P., born in 1999, but Conley provided financial assistance and N.P. went to live with her mother and Conley in 2005 or 2006. N.P. called Conley both John and Dad. Conley normally walked around the house in boxer shorts and nothing else which made N.P. feel very uncomfortable.

[3] N.P.'s cousin, A.D., born in 1996, visited N.P. on multiple occasions. On a Saturday morning, A.D., N.P., and Conley were beneath covers watching cartoons, and Conley touched N.P. in her genitals. Other times, Conley touched N.P.'s vagina in the bedroom, the kitchen, the living room, and while

going to Wal-Mart, and he touched her clitoris. Conley also put his mouth "down there" and would lick three or four times. Transcript I at 180.[1]

[4] While Conley and N.P. were standing in the kitchen when she was about seven or eight years old, he kept talking about putting his penis in her mouth, saying that it would be fun and that she should try it, and then told her to "do it." *Id.* at 181. Conley pulled down his red boxers and then put his penis in N.P.'s mouth for "[f]ive ten minutes if that." *Id.* at 182. He ejaculated into her mouth. N.P. found the ejaculate to be salty and have "about the texture of glue," and she ran to the trash can and spit it out. *Id.* at 183.

[5] Another time when N.P. was ten or eleven years old, Conley, N.P., and A.D. were in a bedroom, N.P. and A.D. were face down on a bed, and Conley stood behind them. Conley put lotion onto a "long and tan and double-headed" dildo that he kept in a locked black filing cabinet and inserted the dildo into N.P.'s anus. *Id.* at 185.

[6] Conley also kept DVDs and pornographic magazines in the filing cabinet, and Conley and N.P. watched movies of "people having sex" twice a month on DVD or on a computer in the living room. *Id.* at 189. While they watched the movies, Conley would either be rubbing his penis or rubbing N.P. During one

---

[1] Conley's notice of appeal requested the transcript of certain portions of the record, and a transcript containing these portions was filed on October 20, 2014. Following a motion by the State and an order from this court, a transcript with the remaining portions of the transcript was filed on April 13, 2015. We cite to the transcript that was filed on October 20, 2014, as "Transcript I," and the transcript filed on April 13, 2015, as "Transcript II."

time watching pornography, Conley rubbed N.P.'s shoulders and became aroused.

[7] At some point, Conley performed oral sex on A.D. Specifically, he told A.D. to "get on [her] back and . . . pull [her] pants down and lift [her] legs up," and he then proceeded to lick her vagina. *Id.* at 249. On one occasion, A.D. was in the bedroom counting out money because she and N.P. were playing a game, Conley entered the room, leaned down, and started to "finger" her. *Id.* A.D. lost count, and Conley walked out laughing. Conley touched her female sex organ with his fingers more than ten times.[2] Conley also placed lotion on his penis and placed it into A.D.'s anus on multiple occasions.[3] After anal sex, A.D. had a "really hard time pooping" and went to see her doctor. *Id.* at 253.

[8] One time when A.D. was exiting the bathroom and Conley and N.P. were on the bed, Conley told A.D. to come over and suck his penis, and A.D. did so. Conley never attempted vaginal intercourse with A.D. because he said "it would get him caught." *Id.* at 258. A.D. was seven years old "when all this stuff" with Conley started happening and it continued until she was fourteen years old. *Id.* at 260.

---

[2] A.D. initially testified that Conley touched her vagina with his fingers more than ten times. She testified that Conley touched her vagina with his fingers "[a] lot," that it was more than ten times, and that she was "not really sure" whether it was "a lot more than twenty." Transcript I at 248. As detailed below, A.D. clarified that Conley's fingers did not touch her vagina but that he rubbed her clitoris and that his fingers went inside her vaginal lips.

[3] When asked how many times Conley put his penis in her anus, A.D. answered: "Twenty or fifteen times, I'm not really sure on the amount." *Id.* at 250.

[9] N.P. talked to A.D. about Conley's actions, and A.D. told her not to tell people because N.P. would "get in trouble." *Id.* at 191. At some point, A.D. told N.P. that she was ready to "come out and tell." *Id.* at 202. N.P. initially denied being molested because Conley told her that if she said anything that she would be taken away from her mother, and she was afraid they were going to lose their home because Conley was the only person working. The Department of Child Services became involved and contacted the Indiana State Police.

[10] On October 25, 2011, Indiana State Police Detective David Miller met with Conley at the Harrison County DCS Office. On November 10, 2011, Conley arrived at the Indiana State Police Sellersburg post and met with Delmar Gross, a polygraph examiner with the Indiana State Police. Conley informed Gross that he had talked to a couple of lawyers and that one of the attorneys told him that the polygraph results should not be admissible in court. Gross asked Conley if he had an attorney, and Conley said "no he had not hired one at that time." *Id.* at 326.

[11] Prior to taking the polygraph examination, Gross reviewed a Stipulation as to Admissibility of Polygraph Examination Result (the "Stipulation"). The Stipulation stated that Conley "after reading and understanding his rights and signing a waiver, now enters into an agreement to stipulate as to the admissibility of a polygraph examination to be taken" by him on November 10, 2011. State's Exhibit 1 at 1. The Stipulation also stated that the "written report of the results of said examination will be introduced into evidence, without an

objection by either the State, [Conley,] or counsel thereof, at the time of the examiner's testimony at any trial or hearing." *Id.* at 2. It also provided:

> 10. That [Conley] hereby certifies that Dave Miller, a detective with the Indiana State Police, has thoroughly discussed that polygraph examination results are not allowed to be admitted as evidence under current court rules, and that [Conley] hereby knowingly, voluntarily, and expressly waives his right to have such evidence excluded from any trial, hearing, or proceeding.
>
> 11. That [Conley] hereby certifies that Dave Miller and/or an agent of the Indiana State Police has thoroughly discussed the taking of a polygraph examination; the effect and meaning of this stipulation, including the admissibility of the examiner's report, testimony and/or opinions in any trial or hearing involving [the] offense that has been alleged in the above matter; and, that the examiner's report, testimony and/or opinions could result in [Conley] being charged and/or convicted of the offense alleged in this matter.
>
> 12. That the State and [Conley] hereby expressly waive any and all objections of said examiners' testimony as to the competency, weight, relevancy, remoteness, or admissibility of such testimony based on legal, judicial, social policy, due process of law, and/or such rules of evidence as might otherwise govern.

*Id.* at 2-3.

[12] Gross read the Stipulation to Conley, and Conley took a break for about five minutes to think about it in the lobby or outside and came back in and agreed with the Stipulation. Gross also reviewed a waiver of rights form informing Conley of his rights. Gross and the waiver of rights form informed Conley of

his right to remain silent, that anything he said could be used against him in court, that he had the right to talk to a lawyer for advice before they asked any questions and to have him or her with him during questioning, that a lawyer would be appointed for him before questioning if he wished, and that he had the right to stop answering at any time until he talked with a lawyer. Conley appeared to understand the rights and the Stipulation, did not appear to be under the influence of any drugs or narcotics, and was cooperative. He agreed with everything in the form, said that he understood, and signed the form and the Stipulation.[4]

[13] Gross asked Conley what his understanding was as to why he had been asked to take a polygraph examination, and Conley said that A.D. had said "some stuff" of a sexual nature about him. *Id.* at 317. Gross asked Conley if his penis ever touched A.D. in a sexual manner, and Conley answered no. Gross then asked him if he was being truthful when he said that his penis never touched A.D. in a sexual manner, and Conley answered yes.[5] Based on the charts and Conley's answers, Gross concluded that Conley was being deceptive. Gross reported to Conley that he had failed the test, and Conley said that he did not touch A.D. or N.P. and elected to end the interview.

---

[4] We acknowledge that the record is somewhat unclear as to the timing of the signatures on the Stipulation and the waiver of rights form. The Stipulation was dated November 9, 2011, and the waiver of rights form was dated November 10, 2011, but both were file-stamped at 9:27 a.m. on November 9, 2011. Nonetheless, defense counsel asserted that Conley signed the documents on November 10, 2011, and Conley states on appeal that he "signed the waiver and the stipulation on November 10, 2011." Appellant's Brief at 12.

[5] During the polygraph examination, Gross asked about only A.D.

[14] At some point, Harrison County Sheriff's Lieutenant Nicholas Smith went to Conley's home, and Conley's wife gave him permission to search the home. Lieutenant Smith located a bottle of lotion next to the bed as described by N.P. and the locked black metal filing cabinet. Conley's wife obtained the keys to the filing cabinet, and Lieutenant Smith discovered pornography and numerous dildos including a double-headed dildo. Lieutenant Smith also took a computer because N.P. had alleged that she watched pornography with Conley, and the United States Secret Service recovered internet browsing history files related to a vast number of pornography sites.

[15] On May 22, 2012, Lieutenant Smith obtained a search warrant to view, inspect, and photograph Conley's pubic region and genitalia because N.P. and A.D. had alleged that his pubic region was shaved. Lieutenant Smith determined that Conley's pubic region was shaved and photographed his penis and pubic region.

[16] On August 10, 2012, the State charged Conley with nineteen counts of child molesting as class A felonies and one count of child molesting as a class C felony. Counts I to XV related to A.D., and Counts XVI to XX related to N.P.

[17] On July 23, 2013, Conley filed a motion to suppress the polygraph examination results. He argued that the Stipulation did not conform to well-established prerequisites, did not constitute a valid contract, and was inadmissible because

he did not waive his right to counsel. On August 6, 2013, the court held a hearing on Conley's motion to suppress, and denied it two days later.[6]

[18] In a letter dated October 18, 2013, Brandon Harley, an inmate housed with Conley, sent a letter addressed to prosecutors in which Harley stated that Conley said that he had sex with those two "little girls" and that he was not in the right state of mind. State's Exhibit 4. At some point, Lieutenant Smith interviewed Harley, and Harley said that he overheard Conley speaking with another inmate and admitted that he had sexual intercourse "with those girls." Transcript II at 239. Harley had already been convicted and sentenced for the crimes he committed and did not attempt to "get a deal or break" in exchange for his information. *Id.* at 250.

[19] A jury trial began on February 4, 2014. During opening statement, the prosecutor said: "What will you hear from the defense?" Transcript I at 101. The prosecutor also asserted that the defense was going to say that N.P. likes to lie, that A.D. made up a story to protect her cousin, and that the defense would "not be able to explain why she (inaudible) make this up." *Id.* at 98. After the prosecutor's opening statement, defense counsel moved for a mistrial and argued that the prosecutor indicated that the burden was on Conley to prove

---

[6] At the hearing, the prosecutor stated that the parties would jointly move to admit a video recording of the advisements regarding the polygraph. The court stated that the DVD was admitted into evidence by agreement of the parties. No evidence was presented, and the parties' attorneys merely argued. At the end of the hearing, the court stated "thank you and let me get ahold of that DVD then." Transcript I at 48. The record on appeal does not include a copy of the DVD.

"why [A.D.] would have made those statements in confirming . . . or statements of what happened we have to come up with the reasons." *Id.* at 104. The prosecutor responded that he did not say that the defense had a burden to prove anything. The court took a break to listen to the opening statement, and after further discussion, found that the prosecutor's statements did not necessarily implicate Conley's Fifth Amendment right to remain silent. The court noted the frequency and context of the prosecutor's statements, the previous jury instructions that opening statements were not evidence but rather what the lawyer expects the evidence will be, and that the defendant was not required to present any evidence to prove his innocence or explain anything, and denied the motion. Defense counsel requested an admonition without reference to the specific language used by the prosecutor, and the court admonished the jury.

[20] A.D., N.P., Gross, and Lieutenant Smith testified to the foregoing facts. The prosecutor asked A.D. "when you say he fingered you do you mean his finger actually went inside your vagina?" *Id.* at 249. A.D. answered: "I don't really remember." *Id.* at 250. During direct examination she testified that Conley rubbed on the outside, that she did not think that he ever actually went in, that the act of "getting fingered" means "rubbing on the clit or sticking your fingers in the vagina," that Conley fingered her, and that her clit is located on the outside. *Id.* at 260. On cross-examination of A.D., the following exchange occurred:

Q. And I was a little confused in your testimony about whether he put his fingers inside your vagina. You said he rubbed, he didn't then the questions that the Prosecutor asked about fingering, you indicated that he did. Then you came back and said he didn't I'm trying to be clear?

A. My definition of fingering is either putting the fingers in the vagina or rubbing on the clit.

Q. So he didn't put his fingers in your vagina he just rubbed on it?

A. Not that I remember.

Q. Is that right?

A. Yes.

Q. The clit you think is outside the vagina is that right?

A. Yes.

Q. So he rubbed outside?

A. Yes.

*Id.* at 276-277.

[21] On redirect examination, A.D. testified that she did not know what the outer part of her vagina was called but had been told that it is called the clit, that she knew what the lips on the vagina are, that it was possible to rub on the lips of

the vagina and not be on the inside of the vagina, that her definition of being inside the vagina was "actually penetrating into . . . in the canal," and that Conley was inside of her vaginal lips. *Id.* at 288. When later asked "[a]re the lips part of the vagina," A.D. answered: "In a way. I would suppose, yes." *Id.* at 294. She testified that it was possible to pull the lips apart and that Conley "did stick his finger between" her vaginal lips. *Id.* at 296. On recross-examination, defense counsel asked: "You previously testified that his fingers had rubbed you, his fingers were outside the vagina, is that correct?" *Id.* at 297. A.D. answered: "Yes." *Id.* at 298. On redirect examination, A.D. clarified that her answer was according to her definition of a vagina.

[22] Defense counsel introduced Defendant's Exhibit A, a document file-stamped November 9, 2011, which stated:

> The Court being duly advised as to the terms of the proceeding stipulation . . . and hearing having been held now finds that Leo J. Conley has thoroughly discussed with an agent of the Indiana State Police and/or counsel the nature and consequences of submitting to a stipulated polygraph examination and specifically that Leo J. Conley has knowingly and voluntarily with or without the advice of counsel waived . . . says her right . . . to have such evidence excluded at any trial, hearing, or proceeding.

*Id.* at 333. Gross stated that this document was signed by a judge and appeared to have been signed on November 9, 2011. Defense counsel moved to admit Defendant's Exhibit A, and the prosecutor argued that the order had been vacated and rescinded and was irrelevant. Defense counsel conceded that the order was vacated. The court stated: "[D]efendant's exhibit A will be held onto

and it'll be part of the record but it's uh . . . defendant's A is not admitted . . . ." Transcript II at 73.

[23] Harley testified that he was incarcerated in the same pod with Conley, he did not want to be there testifying, he sent a letter to the prosecutor stating that Conley said that he had sex "with them two little girls," Conley said that he "wasn't in his right state of mind," he "used that dildo in them two little girls," and that he had "a lawyer out of Louisville." *Id.* at 86, 88. He also testified that no offer was made to him in exchange for his testimony.

[24] A.D.'s mother testified that A.D. always wanted to spend the night at Conley's residence, but that changed at some point and A.D. no longer wanted to do so.

[25] Conley testified that he provided N.P.'s mother with financial and moral support to regain custody of N.P. and that N.P. came to live with him and her mother when she was six years old. Conley testified that he was afraid to be alone with N.P. and that N.P.'s father was serving time for child molesting. He denied the charges and testified that A.D. and N.P. were lying. He testified that his understanding regarding the polygraph examination was "regardless whatever happened the results were not admissible in Court." Transcript I at 385. He reached that understanding because Alex Stone, a lawyer, told him that. He testified that he read and signed the Stipulation.

[26] The jury found him guilty as charged. The court sentenced him to concurrent terms of thirty-two years each for Counts I through XV, the charges of child molesting as class A felonies related to his acts against A.D., thirty-two years

each for Counts XVI through XIX, the charges of child molesting as class A felonies related to his acts against N.P., to be served concurrent with each other and consecutive to Counts I through XV, and five years for Count XX, child molesting as a class C felony for his act related to N.P., to be served concurrent with Counts XVI through XIX and consecutive to Counts I through XV. Thus, the court sentenced Conley to an aggregate sentence of sixty-four years.

## *Discussion*

### I.

[27] The first issue is whether the trial court abused its discretion by admitting the results of the polygraph examination. We review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[28] In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon trial evidence and may consider hearing evidence only if it

does not conflict with trial evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 n.1 (Ind. 2014). It also considers the evidence from the suppression hearing that is favorable to the defendant only to the extent it is uncontradicted at trial. *Carpenter*, 18 N.E.3d at 1001.

[29] Before addressing his arguments, we note that, in *Owens v. State*, the court held that as a general rule the results of a polygraph examination are not competent evidence and are inadmissible at trial, but that where all the parties by stipulation have waived any objection, the court may allow the results to be admitted. 176 Ind. App. 1, 3, 373 N.E.2d 913, 914-915 (1978). The court also noted: "The defendant's counsel would be required to sign the stipulation only when a defendant's 6th amendment right to counsel has already attached and where the defendant has not waived such right to counsel." *Id.* at 3 n.2, 373 N.E.2d at 915 n.2. We held that the prerequisites for the use of polygraph test results set forth in *State of Arizona v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (Ariz. 1992) largely reflected the law in Indiana and adopted them in their entirety. *Id.* at 4, 373 N.E.2d at 915. The Indiana Supreme Court approved of these prerequisites. *See Davidson v. State*, 558 N.E.2d 1077, 1085 (Ind. 1990) (observing that the Court in *Pavone v. State*, 273 Ind. 162, 402 N.E.2d 976 (1980), approved the prerequisites outlined in *Owens*).

[30] Conley contends that the trial court abused its discretion based upon: (A) Defendant's Exhibit A and the idea that each party's signature was not on the Stipulation prior to the administration of the polygraph examination; (B) the Stipulation is unenforceable because it was not a valid contract; and (C) the

Stipulation was unenforceable because Conley did not waive his right to counsel.

A. *Timing of Signatures on Stipulation and Defendant's Exhibit A*

Conley argues that the Stipulation does not conform to well-established prerequisites, specifically that Defendant's Exhibit A was signed by a judge on November 9, 2011, that the Stipulation was filed on November 9, 2011, but that he did not sign the waiver and Stipulation until November 10, 2011. He asserts that "[t]he above timeline proves that the well-established prerequisite that each party's signature shall be on the stipulation prior to the administration of the exam was not satisfied when the 'Stipulation as to the Admissibility of Polygraph Examination Result' was pre-signed by a judge and filed with the Court on November 9, 2011." Appellant's Brief at 12.

As mentioned, the court did not admit Defendant's Exhibit A and Conley does not challenge this decision. Nonetheless, to the extent Gross testified to the contents of Defendant's Exhibit A and it is included in the record, we note that Conley's counsel conceded that the order was vacated. We cannot say that Conley has developed a cogent argument regarding the impact of Defendant's Exhibit A and cannot say that the trial court abused its discretion on this basis.

B. *Contract*

Conley asserts that the Stipulation was unenforceable because prior to signing it, he demonstrated that he did not understand it, stated that he did not believe

the results would be admissible, was not fully informed, lacked the sophistication to evaluate the Stipulation, and that there was no mutual assent.

[34] Such stipulations generally are contracts between the State and the defendant. *See Willey v. State*, 712 N.E.2d 434, 440 (Ind. 1999). Contract law principles therefore control their use and interpretation, including the well-settled doctrine that an ambiguity is to be construed against the party who prepared the contract. *Id.* "In order for this evidence to be admissible, it must be agreed to in unambiguous terms and the stipulation agreement, like any other contract, must not be the product of misrepresentation or mistake of fact." *Id.* at 441.

[35] Conley does not argue that the Stipulation was ambiguous or develop an argument with respect to his level of sophistication. The record reveals that Gross read the Stipulation to Conley, and Conley took a break for about five minutes to think about it, and came back in and agreed with it. Gross testified that Conley agreed with everything in the waiver of rights form, said that he understood, and then signed the form. Further, Gross testified that Conley appeared to understand his rights and the Stipulation, and that he did not appear to be under the influence of any drugs or narcotics and was cooperative. Conley testified that he could read and that he graduated from high school. At trial, the following exchange occurred during his cross-examination:

> Q. What do you think that last part means? That you have discussed that polygraph examination results are not allowed to be admitted under current Court rules and that Leo Conley hereby knowingly or voluntarily and expressly waives his right to

have such evidence excluded. What do you think that means?
That's pretty clear.

A. Yeah.

Transcript I at 388. We cannot say that the trial court abused its discretion on this basis.

C. *Right to Counsel*

[36]    Conley argues that his right to counsel under the Sixth Amendment attached at the moment immediately before he was asked to sign the Stipulation because the request constituted the initiation of a critical stage in his confrontation with law enforcement. His statement that he had not hired an attorney "yet," indicated his intention not to waive his right to counsel. Appellant's Brief at 14.

[37]    The State's position is that the Sixth Amendment right to counsel does not attach until the initiation of criminal proceedings through the filing of charges or the arraignment.

[38]    The parties discuss *Kochersperger v. State*, 725 N.E.2d 918 (Ind. Ct. App. 2000), and *Caraway v. State*, 891 N.E.2d 122 (Ind. Ct. App. 2008), *reh'g denied*. In *Kochersperger*, a detective reviewed with Michael Lee Kochersperger an advice of rights form containing *Miranda* warnings, and including an advisement of his right to counsel. 725 N.E.2d at 921. Kochersperger read and signed the form. *Id.* The meeting culminated in Kochersperger signing an agreement with the prosecutor to undergo a polygraph examination and stipulating that the results

would be admissible at any trial. *Id.* On appeal, the court addressed Kochersperger's argument that his Sixth Amendment right to counsel was violated because he was not represented at the time the examination was administered and the interrogation was conducted. *Id.* at 922.

[39] The court addressed Kochersperger's argument that his stipulation was not signed by defense counsel because he had no representation at the time. The court held that he was fully advised of his right to counsel prior to executing the stipulation and waived such right by signing the advice of rights form. *Id.* at 922-923.

[40] With respect to Kochersperger's argument that his right to counsel under the Sixth Amendment was violated when the polygraph examination and post-testing interrogation were conducted without the presence of defense counsel, this court observed that the Sixth Amendment "provides that an accused has a right to counsel 'at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.'" *Id.* (quoting *Jones v. State*, 655 N.E.2d 49, 54 (Ind. 1995) (quoting *United States v. Wade*, 388 U.S. 218, 226, 87 S. Ct. 1926, 1932 (1967)), *reh'g denied*). "Such a stage is considered a 'critical stage,' that is, any stage in a criminal proceeding where incrimination may occur or where the opportunity for effective defense must be seized or be foregone." *Id.* (quoting *Greenlee v. State*, 477 N.E.2d 917, 920 (Ind. Ct. App. 1985)). The court observed that the defendant had not been arrested, arraigned, or indicted at the time he signed the agreement and stipulation, nor had he been so at the time the polygraph

examination and post-testing interrogation were conducted. *Id.* at 924. The court held that, "[a]s such, the examination and interrogation did not constitute critical stages of a criminal proceeding because criminal proceedings had not yet commenced; likewise, [the defendant's] right to counsel had not yet attached." *Id.* The court concluded that the defendant was not deprived of his Sixth Amendment right to counsel, and the trial court did not err when it denied his motion to suppress on such grounds. *Id.* *See also Weaver v. State*, 583 N.E.2d 136, 139 (Ind. 1991) ("The sixth amendment right to counsel attaches 'at or after the initiation of adversary judicial criminal proceedings.'" (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 111 S. Ct. 2204, 2207 (1991) (quoting *United States v. Gouveia*, 467 U.S. 180, 188, 104 S. Ct. 2292, 2297 (1984)))); *Dullen v. State*, 721 N.E.2d 241, 242 (Ind. 1999) ("It is well settled that the Sixth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against the defendant. Once charges are filed against a defendant, the Sixth Amendment guarantee of assistance of counsel applies to 'critical' stages of the proceedings.") (citation omitted), *cert. denied*, 531 U.S. 847, 121 S. Ct. 118 (2000), *reh'g denied*.

[41] In *Caraway*, a detective read a stipulation agreement to Thomas Caraway regarding the admission of the results of a polygraph examination which did not include a *Miranda* warning or notice of the defendant's right to counsel. 891 N.E.2d at 124. Approximately twenty days later, the detective observed an officer read to Caraway his *Miranda* warnings from a form which included a

notice of the right to seek the assistance of counsel. *Id.* Caraway signed the form, and the officer administered the polygraph. *Id.*

[42] Upon interlocutory appeal following the denial of Caraway's motion to suppress evidence, a panel of this court disagreed with the result reached in *Kochersperger* that the right to counsel cannot attach earlier than at the initiation of criminal proceedings. *Id.* at 126. The court held that it is "central to that principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State *at any stage of the prosecution, formal or informal, in court or out*, where counsel's absence might derogate from the accused's right to a fair trial." *Id.* The court also observed that Article 1, Section 13 of the Indiana Constitution guarantees the right to counsel at any critical stage of the prosecution where counsel's absence might derogate from the accused's right to a fair trial, and that the rights afforded under Section 13 attach prior to the filing of formal charges. *Id.* at 126-127. The court observed that the stipulation agreement did not include *Miranda* warnings or any notice of right to counsel, and concluded that the absence of notice of Caraway's right to an attorney derogated his right to a fair trial, and that Caraway could not have waived the right because he was never informed of it prior to stipulating to the admission of the results of the polygraph examination. *Id.* at 127.

[43] Assuming that *Caraway* is the proper analysis, we find that case distinguishable. Gross, the polygraph examiner employed by the Indiana State Police, testified that he met Conley on November 10, 2011, when Conley arrived at the state

police post to take a polygraph, and that he read to Conley the Stipulation and the waiver of rights form prior to administering the polygraph. The waiver of rights form informed Conley of his right to speak to a lawyer and to have a lawyer appointed. Conley admits that he signed the waiver and Stipulation on November 10, 2011. Gross testified that Conley appeared to understand the rights that he went over him with as well as the Stipulation. During cross-examination, Conley's counsel asked Gross: "And if he hadn't . . . if he came into see you that day and said I don't stipulate then you would have said that's the end of the test, you wouldn't . . . you wouldn't have gone on with the test, isn't that true?" Transcript I at 324-325. Gross answered: "True." *Id.* at 325. Under these circumstances, we cannot say that the trial court abused its discretion in admitting the evidence regarding the polygraph examination. *See State v. Wroe*, 16 N.E.3d 462, 467-468 (Ind. Ct. App. 2014) (observing the different conclusions in *Kochersperger* and *Caraway*, stating that "[w]ithout expressing opinion on the results reached by these two panels, we note that the instant case is distinguishable from both," and holding that the stipulation was not invalid even if a right to counsel attached before the defendant signed the stipulation and/or before he underwent the polygraph examination because the defendant knowingly and voluntarily waived that right), *trans. denied*.

## II.

[44] The next issue is whether the court erred by denying Conley's motion for a mistrial. In reviewing a claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether that

misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she should not have been subjected. *Coleman v. State*, 750 N.E.2d 370, 374 (Ind. 2001). The "gravity of peril" is measured by the "probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct." *Id.* A trial court is in the best position to evaluate whether a mistrial is warranted because it can assess first-hand all relevant facts and circumstances and their impact on the jury. *Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014) (citing *Kelley v. State*, 555 N.E.2d 140, 141 (Ind. 1990)). We therefore review denial of a motion for mistrial only for an abuse of discretion. *Id.* (citing *Gregory v. State*, 540 N.E.2d 585, 589 (Ind. 1989)). A mistrial is "an extreme remedy granted only when no other method can rectify the situation." *Overstreet v. State*, 783 N.E.2d 1140, 1155 (Ind. 2003), *cert. denied*, 540 U.S. 1150, 124 S. Ct. 1145 (2004).

[45] Conley argues that the prosecutor improperly commented on his right to remain silent and "attempt[ed] to forecast testimony that Conley would give, thereby imposing an expectation on the jury that he must testify in order to mount his defense." Appellant's Brief at 17. He points to the following portion of the prosecutor's opening statement:

> What will you hear from the defense? Well they're going to jump up and down and say [N.P.] denied . . . she denied that Leo Conley molested her on several times before she finally said it. They're going to say [N.P.] likes to lie and make up stories. They're going to say [N.P.'s mother is] a bad mom. They're going to say polygraph exams are unreliable even though the defendant wanted to take it. They're going to say cops drug their

feet investigating these claims. They're going to say [A.D.] made up a story to protect her cousin. They understand this case is several years old and the allegations happened many years ago [;] these girls were a lot younger than they are now. They will nit-pick these inconsistencies.

Transcript I at 101-102.[7]

[46] Conley also challenges the prosecutor's following comment during opening statement:

> One of the girls will undergo a rigorous cross examination about why she denied being molested on at least three occasions before she finally admitted that she wasn't telling the truth. The other girl that did not live with Mr. Conley said from the beginning Mr. Conley molested her. The defense will not be able to explain why she (inaudible) make this up. The evidence will show neither girl had anything to gain from this disclosure.

*Id.* at 98-99. Conley argues that the prosecutor improperly shifted the burden of proof by this statement and that when coupled with the earlier statement, the result was prejudice. The State argues that the prosecutor did not commit misconduct and that the admonishment effectively cured any impact the opening statement may have improperly had upon the jurors.

---

[7] While the paper version of Transcript I does not include page 101, the digital version of Transcript I includes page 101.

After the trial court denied Conley's motion for mistrial, the court admonished the jury as follows:

> Opening statements are not evidence and should be considered only as a preview of what the attorney's [sic] expect the evidence will be. Under the law of this State a person charged with a crime is presumed to be innocent[.] [T]o overcome the presumption of innocence the State must prove the defendant guilty of each essential element of the crime charged beyond a reasonable doubt. The defendant is not required to present any evidence to prove his innocence or to prove or explain anything. You should attempt to fit the evidence to the presumption that the defendant is innocent . . . .

Supplement to Transcript I at 3.

Based upon the record and in light of the trial court's admonishment and jury instructions, we conclude that Conley has not proven prosecutorial misconduct warranting a mistrial. We cannot say that the trial court abused its discretion in denying his motion for a mistrial.

III.

The next issue is whether the evidence is sufficient to sustain Conley's convictions for Counts I to XV, which constitute the charges of child molesting as class A felonies related to A.D. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of

probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

[50] Conley argues that: (A) there was insufficient evidence that his finger penetrated A.D.'s sex organ to support Counts VI to XV; and (B) A.D.'s testimony was that he abused her on no more than three separate occasions and that there is insufficient evidence that fifteen separate charged acts occurred.

A. *Penetration*

[51] Conley points to A.D.'s testimony and posits that there was insufficient evidence that his finger penetrated her vagina or sex organ. The offense of child molesting as a class A felony as charged in Counts VI to XV is governed by Ind. Code § 35-42-4-3(a), which at the time of the offenses provided:

> A person who, with a child under fourteen (14) years of age, performs or submits to sexual intercourse or deviate sexual conduct commits child molesting, a Class B felony. However, the offense is a Class A felony if . . . (1) it is committed by a person at least twenty-one (21) years of age . . . .

(Subsequently amended by Pub. L. No. 158-2013, § 439 (eff. July 1, 2014); Pub. L. No. 247-2013, § 6 (eff. July 1, 2014); Pub. L. No. 168-2014, § 68 (eff. July 1, 2014); Pub. L. No. 187-2015, § 48 (eff. July 1, 2015)). Ind. Code § 35-41-1-9 defined "[d]eviate sexual conduct" as "an act involving: (1) a sex organ of one person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object." (Subsequently repealed by Pub. L. No. 114-2012, §§ 87-102 (eff. July 1, 2012)).

[52] Proof of even the slightest penetration is sufficient to sustain convictions for child molesting. *Spurlock v. State*, 675 N.E.2d 312, 315 (Ind. 1996), *aff'd in relevant part on reh'g*. There is no requirement that the vagina be penetrated, only that the female sex organ, including the external genitalia, be penetrated. *Smith v. State*, 779 N.E.2d 111, 115 (Ind. Ct. App. 2002), *trans. denied*. The definition of the term "object" for the purposes of deviate sexual conduct includes a finger. *D'Paffo v. State*, 778 N.E.2d 798, 802 (Ind. 2002). Whether penetration occurred is a question of fact to be determined by the jury. *Borkholder v. State*, 544 N.E.2d 571, 577 (Ind. Ct. App. 1989).

[53] In *Scott v. State*, the court examined the meaning of "sex organ." 771 N.E.2d 718, 724-725 (Ind. Ct. App. 2002), *disapproved of on other grounds by Louallen v. State*, 778 N.E.2d 794 (Ind. 2002). The court noted that the female external genitalia is defined as "the vulva in the female." *Id.* at 724 (quoting STEDMAN'S MEDICAL DICTIONARY at 641 (25th ed. 1990)). The vulva is defined as "[t]he external genital organs of the female, including the labia majora, labia minora, clitoris, and vestibule of the vagina." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1931 (4th ed. 2006). Labial is defined as "[o]f or relating to the lips or labia." *Id.* at 977. Labia majora are defined as "[t]he two outer rounded folds of adipose tissue that lie on either side of the vaginal opening and form the external lateral boundaries of the vulva." *Id.* Labia minora are defined as "[t]he two thin inner folds of skin within the vestibule of the vagina enclosed within the cleft of the labia majora." *Id.*

[54] While A.D. testified that Conley did not put his fingers inside her vagina, she also testified that it was possible to rub on the inside of the lips but not be on the inside of the vagina, and that being inside the vagina according to her definition was "actually penetrating into . . . the canal . . . [w]here the penis would go if you were having sex." Transcript I at 288. Moreover, she testified that Conley was inside her vaginal lips and that Conley "did stick his finger between" her vaginal lips. *Id.* at 296. She also testified that Conley fingered her which she defined in part as "rubbing on the clit." *Id.* at 260.

[55] Based upon the record, we conclude that the State presented evidence of a probative nature from which a reasonable trier of fact could have found that Conley penetrated A.D.'s sex organ with his finger and was guilty of child molesting as a class A felony. *See Morales v. State*, 19 N.E.3d 292, 297-298 (Ind. Ct. App. 2014) (rejecting the defendant's argument that penetration of the female external genitalia does not constitute penetration of the female sex organ), *trans. denied*; *Short v. State*, 564 N.E.2d 553, 559 (Ind. Ct. App. 1991) (observing that "[t]o sustain convictions for child molesting and incest, proof of the slightest penetration is sufficient," that the "statute defining sexual intercourse does not require that the vagina be penetrated, only that the female sex organ be penetrated," and holding that the evidence that the defendant penetrated the victim's external genitalia was sufficient to support his unlawful sexual intercourse convictions even though the evidence failed to indicate that the victim's vagina was penetrated).

B. *Fifteen Counts*

[56] Conley argues that A.D.'s testimony was that he abused her on no more than three separate occasions. The State argues that it sufficiently proved that the number of molestations that occurred equaled or exceeded fifteen.

[57] It is well settled that time is not of the essence in the crime of child molesting. *Barger v. State*, 587 N.E.2d 1304, 1307 (Ind. 1992), *reh'g denied*. This is so because "it is difficult for children to remember specific dates, particularly when the incident is not immediately reported as is often the situation in child molesting cases." *Id.* The Indiana Supreme Court recognizes that a child may be victimized by "an abuser residing with the child . . . [who] perpetuate[s] the abuse so frequently . . . that the young child loses any frame of reference in which to compartmentalize the abuse into distinct and separate transactions" and therefore can only give "generic evidence" of a defendant's conduct. *Baker v. State*, 948 N.E.2d 1169, 1174 (Ind. 2011) (quoting *R.L.G. v. State*, 712 So.2d 348, 356 (Ala. Crim. App. 1997)), *reh'g denied*. The victim's "generic testimony" may describe a pattern of abuse ("every time mama went to the store") rather than specific incidents ("after the July 4th parade").[8] *Id.*

---

[8] The Court in *Baker* held that, if the State decides not to designate a specific act or acts on which it relies to prove a particular charge, then "the jurors should be instructed that in order to convict the defendant they must either unanimously agree that the defendant committed the same act or acts or that the defendant committed all of the acts described by the victim and included within the time period charged." *Baker*, 948 N.E.2d at 1177. Conley does not raise any argument regarding the jury instructions.

[58] A.D. testified that Conley molested her and that he "would stick his penis in [her] butt." Transcript I at 247. She testified that Conley placed lotion on his penis and placed it into her anus on multiple occasions. When asked how many times Conley put his penis in her anus, A.D. answered: "Twenty or fifteen times, I'm not really sure on the amount." *Id.* at 250. This evidence supports Conley's convictions under Counts I to III which alleged that he committed child molesting as class A felonies and that he "placed his penis and/or a sexual aid resembling a penis, also known as a dildo, into the anus of A.D." Appellant's Appendix at 15-17. A.D. testified that Conley performed oral sex on her. This testimony supports Count IV in which the State alleged that Conley "placed his mouth on the vagina of A.D." *Id.* at 18. A.D. testified that one time when she was exiting the bathroom and Conley and N.P. were on the bed, Conley told A.D. to come over and suck his penis, and A.D. did so. This evidence supports Count V in which the State alleged that Conley "placed his penis in the mouth of A.D." *Id.* at 19. Lastly, A.D. testified that Conley touched her "vagina" with his fingers at least ten times. Transcript I at 248. This evidence supports Counts VI to XV. A.D. was seven years old "when all this stuff" with Conley started happening and it continued until she was fourteen years old. *Id.* at 260. Based upon the record, we conclude that the State presented evidence of a probative nature from which a reasonable jury could have found beyond a reasonable doubt that Conley committed fifteen counts of child molesting against A.D.

## *Conclusion*

[59] For the foregoing reasons, we affirm Conley's convictions.

[60] Affirmed.

Crone, J., and Pyle, J., concur.