## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 03 2016, 5:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Shahid Iqbal,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 3, 2016<br><br>Court of Appeals Case No.<br>55A01-1507-PC-937<br><br>Appeal from the Morgan Superior Court<br><br>The Honorable Jane Spencer Craney, Judge<br><br>Trial Court Cause No.<br>55D03-1402-PC-161 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Shahid Iqbal appeals the denial of his petition for post-conviction relief, which he filed after this Court affirmed his convictions for the murder of his wife and several other crimes. The post-conviction court rejected his claims that his attorney provided ineffective assistance both at trial and on appeal and that two of his convictions violate the Indiana Constitution's ban on double jeopardy. Finding no error, we affirm.

# Facts and Procedural History

[2] In July 2002, Iqbal and his wife Tammy were going through a divorce and were living separately. However, on the morning of July 6, their daughter, A.I., awoke to find Iqbal in Tammy's apartment. They were arguing, and Iqbal had a gun in his hand. Tammy and A.I. attempted to leave the apartment, but Iqbal physically prevented them from doing so. At one point, Tammy was able to get the gun and unload it, but Iqbal then pulled Tammy's fingers backwards, took the gun back, and reloaded it. The arguing gradually subsided, and Iqbal and Tammy were just talking, but then A.I., who was playing a game in an adjoining room, heard a gunshot. Tammy had been shot in the middle of the chest. When A.I. looked up, the gun was laying on the counter, and Iqbal was walking to the couch and crying. A.I. ran outside screaming, and a neighbor came to the apartment. Tammy was still alive at that point, but the neighbor never saw Iqbal go near her, and Tammy eventually died. Iqbal later told

police that he did not intend to shoot Tammy and that the gun "went off by itself." Trial Ex. 29C, p. 71.

[3] The State charged Iqbal with murder, neglect of a dependent (for firing the gun near A.I.), and several other crimes. Before trial, the State filed a motion seeking permission to introduce evidence of prior misconduct by Iqbal pursuant to Indiana Rule of Evidence 404(b). The trial court granted the State's motion in part, allowing the State to present evidence of acts committed during the year before the shooting (i.e., July 7, 2001, through July 6, 2002). Chief among these was an incident on March 18, 2002, during which Iqbal placed a gun against Tammy's head and threatened to kill her.

[4] The trial was held in June 2003. During jury selection, the court and Iqbal's attorney questioned a potential juror whose wife worked in the child-support division of the prosecutor's office. He said he could be fair to both sides, and Iqbal's attorney did not move to strike him from the jury pool, either peremptorily or for cause. He eventually became the foreman of the jury.

[5] The State presented more than thirty witnesses who testified about the confrontation and arguing on the day of the shooting, the shooting itself, Iqbal's statements to police after the shooting, the March 18, 2002 incident, and other pre-shooting conduct by Iqbal, including following Tammy, sitting outside her place of employment, pushing and shoving her, and on one occasion starting to grab her by the hair. Multiple witnesses also testified to having heard Iqbal say something like, "If I can't have her, no one will." Tr. p. 842, 865. In addition

to all of this evidence, the trial court, over numerous hearsay objections by Iqbal's attorney, allowed eleven witnesses to testify about things Tammy had told them: that she was afraid of Iqbal, that he had threatened her, and that she thought he was going to kill her. The trial court admitted this testimony under Indiana Rule of Evidence 803(3), which establishes a state-of-mind exception to the general prohibition against hearsay evidence.

[6] The trial court also allowed the State to present the testimony of an expert on the behavior of victims of domestic violence, that is, Battered Woman Syndrome. The expert did not testify about Tammy specifically or the facts of this case. Rather, she testified, among other things, that victims of domestic violence struggle to leave their abusers and that leaving is when they are most at risk. The trial court allowed this testimony so that the jury could be "educated" about domestic violence because domestic violence had "been an issue throughout this case." *Id.* at 999.

[7] Near the end of the prosecutor's closing argument, he referred to Iqbal, who is from Pakistan, as a "terrorist":

> PROSECUTOR: Why . . . if this is your wife and your daughter and there's no outside protector, what's the gun for? As a father, as a protector with an eight-year-old daughter, I have an absolute right to defend my daughter and my wife and myself and you do to[o]. But who's he defending them from? Folks, he's become the terrorist within. He's become . . .

> DEFENSE COUNSEL: Your Honor, I mean I object to the reference of terrorist.

COURT: Sustained.

PROSECUTOR: He's become the person who unlike the father and husband being the protector become the enemy [sic]. . . .

Trial Tr. p. 1128-29. Iqbal's attorney did not ask the court to admonish the jury regarding the "terrorist" comment, nor did he request a mistrial.

[8] The trial court instructed the jury on both murder and reckless homicide, but the jury found Iqbal guilty of murder and on all of the other counts. After sentencing Iqbal to 58 years, the trial court appointed Iqbal's trial attorney to represent him on appeal.

[9] In his brief on appeal, Iqbal's attorney did not challenge the hearsay evidence to which he had repeatedly objected during trial. Instead, he argued that the trial court abused its discretion by admitting (1) the 404(b) evidence (primarily the March 18, 2002 incident) and (2) the testimony of the domestic violence expert. We rejected both arguments and affirmed Iqbal's convictions. *Iqbal v. State*, 805 N.E.2d 401 (Ind. Ct. App. 2004). Iqbal's attorney did not petition for transfer to the Indiana Supreme Court.

[10] Ten years later, Iqbal filed a petition for post-conviction relief. He claimed that his attorney provided ineffective assistance in a variety of ways, including: (1) failing to challenge for cause the potential juror who was married to an employee of the prosecutor's office; (2) failing to request an admonishment and a mistrial after the prosecutor referred to Iqbal as a "terrorist"; (3) failing to challenge the admission of the hearsay evidence on appeal; and (4) failing to file

a petition to transfer regarding the admission of the Battered Woman Syndrome evidence.

[11] In an affidavit executed before the post-conviction hearing, and again at the hearing, Iqbal's attorney stated that most of the issues complained of by Iqbal were the result of sloppiness and personal issues, not strategy. In a post-hearing memorandum, Iqbal added a claim that his convictions for murder and neglect of a dependent violate the actual-evidence test under the Double Jeopardy Clause of the Indiana Constitution. The post-conviction court adopted verbatim the State's proposed findings of fact and conclusions of law and rejected all of Iqbal's claims.

[12] Iqbal now appeals.

# Discussion and Decision

[13] Iqbal contends that the post-conviction court erred by rejecting both his ineffective-assistance-of-counsel claims and his double jeopardy claim. A person seeking post-conviction relief bears the burden of establishing grounds for relief by a preponderance of the evidence. *Hollowell v. State*, 19 N.E.3d 263, 268-69 (Ind. 2014). When appealing from the denial of such relief, the petitioner stands in the position of one appealing from a negative judgment. *Id.* at 269. To prevail, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id.* We review the post-conviction court's legal conclusions

de novo, but we will not reverse its factual findings or ultimate judgment unless they are clearly erroneous, that is, unless they leave us with a definite and firm conviction that a mistake has been made. *Id.* The post-conviction court is the sole judge of the credibility of the witnesses. *Hall v. State*, 849 N.E.2d 466, 468-69 (Ind. 2006).

[14] Iqbal notes that the post-conviction court signed the State's proposed findings of fact and conclusions of law exactly as they were submitted. While this practice erodes our confidence that the findings reflect the considered judgment of the trial court, it is not prohibited. *Prowell v. State*, 741 N.E.2d 704, 709 (Ind. 2001). The question remains whether the findings adopted by the court are clearly erroneous. *Pruitt v. State*, 903 N.E.2d 899, 940 (Ind. 2009), *reh'g denied*.

## I. Ineffective Assistance of Counsel

[15] Iqbal first challenges the post-conviction court's conclusion that his attorney did not provide ineffective assistance of counsel, either at trial or on appeal. A defendant claiming that his attorney was ineffective at trial must show by a preponderance of the evidence that (1) counsel's performance fell below the objective standard of reasonableness based on "prevailing" professional norms and (2) the defendant was prejudiced by this substandard performance, i.e., there is a "reasonable probability" that, but for counsel's errors or omissions, the outcome of the trial would have been different. *Stephenson v. State*, 864 N.E.2d 1022, 1031 (Ind. 2007), *reh'g denied*. The same standard applies to the performance of appellate counsel. *Taylor v. State*, 717 N.E.2d 90, 94 (Ind.

1999). "We afford great deference to counsel's discretion to choose strategy and tactics, and strongly presume that counsel provided adequate assistance and exercised reasonable professional judgment in all significant decisions." *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002).

## A. No challenge for cause of the juror whose wife worked for the prosecutor's office

[16]  Iqbal contends that the post-conviction court erred by concluding that a challenge for cause to the juror whose wife worked in the child-support division of the prosecutor's office would not have been granted and that Iqbal's attorney therefore was not ineffective for failing to make such a challenge. We agree with Iqbal on the first point: he would have been entitled to have the juror stricken for cause. Our Supreme Court has held that a prospective juror who is related to an employee of the prosecutor's office trying the case is presumed to be biased in favor of that office and as such is subject to a challenge for cause. *See Haak v. State*, 417 N.E.2d 321 (Ind. 1981) (holding that spouse of deputy prosecutor was impliedly biased and should not have been allowed on jury); *Barnes v. State*, 330 N.E.2d 743 (Ind. 1975) (explaining that if spouse of second cousin of prosecutor's employee was aware of relationship, "grounds for challenge for cause will have been shown to have existed").

[17]  However, the fact that a challenge for cause would have been meritorious does not mean that the decision of Iqbal's attorney to forego such a challenge constituted deficient performance. The dialogue with the juror during jury

selection, read in its entirety, strongly suggests that Iqbal's attorney's choice to refrain from making a challenge for cause was a strategic one:

> COURT: [Juror], your wife works for the Prosecuting Attorney. How are you going to . . .
>
> JUROR: Yes, Ma'am.
>
> COURT: I know . . . I . . . I would imagine [defense counsel] will ask you a couple questions about that, but is that going to affect you knowing, you know, he is the head guy.
>
> JUROR: No Ma'am, I . . . I don't know him. I met him in a hallway once in all the time that my wife has worked under him and I know . . .
>
> COURT: And child support doesn't do criminal stuff. I don't even think they do the criminal non-support for the dependent, do they?
>
> PROSECUTOR: Not very often.
>
> COURT: Okay.
>
> PROSECUTOR: Bob does most of those.
>
> COURT: All right. So you're telling me you could be fair to both sides?
>
> JUROR: Yes Ma'am, I believe I could.

COURT: Okay, because . . . because that's what I've got to have. Okay. [Defense counsel]?

DEFENSE COUNSEL: Let's . . . okay. I'll . . . we'll . . . we'll talk about that secondly. All right. First thing and I . . . I don't mean to . . . it's not my intent to embarrass you so if I'm treading someplace you don't want me to tread, you let me know. On question, let's see, sixteen, it was all kinds of personal questions about have you ever served as a juror, or if you've ever been a witness, that sort of thing. Question asks then, have you ever been convicted of a crime. If yes, please list the crime, when and where a conviction lies. And you checked yes and then you crossed some stuff out.

JUROR: Yeah, I answer that my mistake [sic]. I haven't served as a juror, but I will answer it if you want me to.

DEFENSE COUNSEL: Okay.

JUROR: I was convicted of DUI in Hancock County quite a number of years ago. I can't remember, so I realized I wasn't supposed to answer it so that was a freebee.

DEFENSE COUNSEL: Okay, all right. Well again, sometimes you never know what you're going to get when you ask that, so I did . . . it wasn't my intent to embarrass you. The question . . . the key thing sir, from my perspective in terms of . . . of your wife's job, it's sort of a feeling or . . . or for example . . . let's say you sit on this jury and you listen to everything and you decide as a juror that [Iqbal] is not guilty. Or you know, he's guilty of something but not everything, whatever, so the question would be at that next Christmas party or next time in the hall or something like this, is there going to be that . . . when you bump into him or vice versa or something, is there going to be that, oh my God, you know, that . . . that look of disa . . . you know . . .

you know what I'm talking about? That's . . . that sort of in a nutshell with awkward way [sic] to say kind of what's an issue here?

JUROR: I'm not a real people person. I doubt seriously . . . I avoid my wife's office as much as I can. I don't like being here.

DEFENSE COUNSEL: That's . . . that's one of the best things I've ever heard. Me too, I don't like being here either.

JUROR: I try to . . . I don't go to office parties, things like that. Frankly if he hadn't been here, I don't know if I would have recognized him second time [sic] if I had walked by and certainly wouldn't have spoken. I'm just not a real personable [sic].

DEFENSE COUNSEL: Well . . . well again I . . . I don't mean to make a mountain out of this molehill, but it's just something that we had to explore so I thank you for your honesty.

Trial Tr. p. 224-26. Several parts of this exchange could have convinced Iqbal's attorney that the juror would be fair, and perhaps even defense-friendly: (1) the juror did not "know" the prosecutor; (2) the juror had met the prosecutor only once; (3) the child-support division of the prosecutor's office does not do "criminal stuff" very often; (4) the juror said he believed he could be fair to both sides; (5) the juror had himself been convicted of a crime; (6) the juror avoided his wife's office as much as possible; (7) the juror did not like being in court; and (8) the juror is not personable and would not have spoken to the prosecutor if they had crossed paths.

Furthermore, in the affidavit he executed shortly before the post-conviction hearing, Iqbal's attorney explained why he was comfortable with the juror:

> I did not strike the juror because his comments regarding his lack of knowledge about the prosecutor made me feel he would not try to influence the other jurors and would keep to himself. Also, the fact that his wife worked in the child support division, which had less of a criminal bent than the rest of the prosecutor's office, reduced my concern I had about the juror's wife's employment.

P-C Ex. E, ¶27. It is true, as Iqbal points out, that the attorney later testified that his failure to challenge the juror for cause was the result of "sloppiness," not strategy, and "wasn't a good decision." P-C Tr. p. 39. Of course, the post-conviction court was not obligated to credit that testimony, especially in light of the attorney's own pre-hearing affidavit. *See Hall*, 849 N.E.2d at 468-69.

Iqbal has not convinced us that his attorney performed deficiently when he failed to challenge the juror for cause.

## B. No request for an admonishment and a mistrial after the prosecutor called Iqbal a "terrorist"

Iqbal also argues that the post-conviction court should have found his attorney to have been ineffective for only objecting to the prosecutor's use of the term "terrorist" and failing to also request an admonishment and a mistrial. We agree with Iqbal that referring to a person of Middle Eastern descent as a "terrorist," especially post-9/11, constitutes inexcusable prosecutorial misconduct. In fact, the post-conviction judge, who also presided over the trial, stated that she remembered the comment and was "shocked" that she had not

admonished the jury even without a request from Iqbal's attorney. P-C Tr. p. 103.

[21] However, even if we assume that Iqbal's attorney performed deficiently by failing to request an admonishment and then a mistrial, there is not a reasonable probability that an admonishment would have changed the jury's verdict, that the trial court would have granted a mistrial, or that this Court or our Supreme Court would have reversed his convictions on direct appeal. The evidence that Iqbal intended to shoot Tammy was overwhelming. Four months before the shooting, Iqbal had held a gun to her head and threatened to kill her. Multiple witnesses testified that Iqbal had said something like, "If I can't have her, no one will." The same witnesses testified that they personally saw Iqbal follow Tammy, sit outside her place of employment, and physically abuse her. Iqbal's own daughter testified that in the hours leading up to the shooting, Iqbal was arguing with Tammy, physically prevented her from leaving the apartment, and aggressively took the gun from her after she had gotten ahold of it and unloaded it. Tammy was shot in the middle of the chest. Iqbal did not attempt to save her. Given all of this evidence, the post-conviction court correctly ruled that the failure to request an admonishment and a mistrial did not amount to ineffective assistance of counsel.

## C. No hearsay challenge on appeal

[22] Next, Iqbal asserts that the testimony regarding Tammy's statements that she feared Iqbal would kill her was inadmissible hearsay, that the trial court abused its discretion by allowing the testimony, and that the post-conviction court erred

when it concluded that Iqbal's attorney was not ineffective for failing to raise the issue on appeal. We agree with Iqbal on the first two points. Because Iqbal's attorney conceded the turbulent nature of the relationship and did not otherwise place Tammy's state of mind at issue during trial, the trial court abused its discretion by admitting the testimony pursuant to the state-of-mind exception (Evidence Rule 803(3)) to the hearsay rule. *See, e.g.*, *Bassett v. State*, 795 N.E.2d 1050, 1051-52 (Ind. 2003) (holding that where defendant had not placed murder victim's state of mind in issue, trial court abused its discretion by allowing witnesses to testify that victim had told them that she feared defendant and that defendant had threatened her); *Willey v. State*, 712 N.E.2d 434, 443-44 (Ind. 1999) (same).

[23] That said, even assuming that Iqbal's attorney performed deficiently by failing to raise the hearsay issue on appeal, raising the issue would not have resulted in the reversal of Iqbal's convictions. In light of the abundant evidence of Iqbal's guilt, as detailed in the preceding section, the trial court's error in admitting the evidence was harmless beyond a reasonable doubt, and the failure to raise the issue on appeal did not constitute ineffective assistance of counsel.

## D. No petition to transfer on Battered Woman Syndrome

[24] Iqbal's final ineffectiveness claim is that his attorney should have filed a petition to transfer asking our Supreme Court to consider the Battered Woman Syndrome issue. He argues that there is a reasonable probability that the Supreme Court would have granted transfer and reversed his convictions. We acknowledge that the use of Battered Woman Syndrome evidence is a thorny

issue and that the use of it in this case—to explain the actions of a victim who did not testify and whose state of mind was not at issue—presented unique and close questions of law. As such, there is a fair chance that our Supreme Court would have granted transfer.[1] Again, though, given the overwhelming evidence of Iqbal's intent to shoot Tammy, even if we assume that Iqbal's attorney performed deficiently by failing to seek transfer, we are fully confident that our Supreme Court would have found any error to be harmless and affirmed Iqbal's convictions. For this reason, we cannot say that the failure to request transfer represented ineffective assistance of counsel.

## II. Double Jeopardy

[25] Iqbal's last argument is that the post-conviction court should have found that his convictions for murder and neglect of a dependent violate the actual-evidence test under Indiana's Double Jeopardy Clause, since they "are predicated on the firing of the same shot." Appellant's Br. p. 37. The State argues that we should not address this issue because Iqbal could have raised it, but did not, on direct appeal. *See, e.g.*, *Allen v. State*, 749 N.E.2d 1158, 1163 (Ind. 2001) (explaining that issues available but not raised on direct appeal are waived for purposes of post-conviction proceeding), *reh'g denied*. The State did

---

[1] As Iqbal notes, Indiana Rule of Appellate Procedure 57(H) lists the "principal considerations governing the Supreme Court's decision whether to grant transfer," including, "(4) *Undecided Question of Law*. The Court of Appeals has decided an important question of law or a case of great public importance that has not been, but should be, decided by the Supreme Court."

not make this waiver argument below, and the post-conviction court addressed the merits of Iqbal's claim. We will do the same.

[26] It is undisputed that Iqbal's murder and neglect-of-a-dependent convictions were based on the same gunshot. However, they involved two separate victims (Tammy and A.I.). Our Supreme Court has held that multiple convictions based on a single act do not violate the actual-evidence test when there are multiple victims. *Bald v. State*, 766 N.E.2d 1170, 1172 (Ind. 2002) (affirming arson and felony murder convictions based on one fire but involving multiple victims). Iqbal bases his actual-evidence claim entirely on the fact that his convictions arose from a single gunshot and does not address the fact that they involved separate victims. Therefore, we will not disturb the post-conviction court's rejection of his double-jeopardy claim.

[27] Affirmed.

Bailey, J., and Crone, J., concur.